The STATE of Ohio, Appellee,

v.

SMITH, Appellant.

[Cite as *State v. Smith* (1998), 130 Ohio App.3d 360.]

Court of Appeals of Ohio,
First District, Hamilton County.

Decided Oct. 16, 1998.

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Philip R. Cummings,* Assistant Prosecuting Attorney, for appellee.

*H. Fred Hoefle* and *John H. Burlew,* for appellant.

DOAN, Judge.

Defendant-appellant Edward Smith appeals his conviction of murder.

## I. FACTS AND PROCEEDINGS

On January 9, 1997, Smith was charged with the murder of Eugene Jenkins. A gun specification was included in the indictment.

The evidence presented by the state at trial indicated that on December 27, 1996, at approximately 8:30 a.m., Michelle Thomas and her friend Cheryl Grissom discovered Jenkins slumped over and apparently unconscious in the driver's seat of his truck, which was parked at the side of the road on the 500 block of Van Buren, near the home of Grissom. After finding Jenkins, Thomas and Grissom placed an emergency call; the Lincoln Heights police responded to the scene. It was then learned that Jenkins had suffered two gunshot wounds to the chest, from which he later died.

Thomas informed the police that at approximately 8:15 a.m., she had been walking to Grissom's home when she had heard a indistinguishable sound, followed by the slamming of a door. As she then rounded the corner, a man ran past her in the opposite direction. Thomas described the man as being in his late forties, black, slightly taller than her height of five feet, four inches, with flared nostrils and a full black and gray beard, wearing glasses, a black jacket and baseball cap, and carrying a bundle of clothing under his arm. Based on this identification, police assembled a photo array of six persons, one of whom was Smith. After viewing the array, Thomas positively identified Smith as the man she had seen.

In addition, Jenkins's son informed police that he had also observed Smith in the vicinity of the murder scene that morning; he stated that he had seen Smith, in his truck, in the driveway next to his father's barbershop. Furthermore, Gregory White, an acquaintance of Jenkins, stated that he had seen Jenkins sometime between 7:30 and 8:00 that morning driving his truck. According to White, Jenkins appeared to be arguing with the passenger in the truck, whom White described as having a beard and glasses.

Meanwhile, at the scene of the murder, police discovered a bloody key ring on the seat of the truck and an audiocassette on the ground directly outside the truck. It was later discovered that blood on the key ring was consistent with Jenkins's blood. In addition, analysis of the audiocassette revealed a recording containing Smith's voice.

At approximately 9:15 a.m., agent Randall Rozier arrived at the scene and became involved in the investigation. Sometime between 10:00 and 11:00 a.m., Rozier went to the home of James Spikner, an employee of Smith's who had been involved with Smith in performing a recent masonry construction project on Jenkins's home. Both Spikner and Jenkins's wife stated that Jenkins and Smith had argued over the amount of money that Smith was due for his masonry work. Furthermore, Spikner recounted that Smith was known to carry a cassette recorder in his chest pocket and would use it to record discussions involving business disputes.

In addition, Spikner agreed to assist Rozier in locating Smith. After being unable to locate Smith at his home, Spikner indicated that Smith may have been at a storage unit located in Roselawn, which he used to store equipment for his construction projects. Once at the storage unit, with Rozier out of sight, Spikner raised the door and saw Smith's truck parked inside. Smith, who had been lying in the bed of the truck, stood up and spoke briefly with Spikner, indicating that he was planning to leave town. As Rozier and Spikner drove away, they observed Smith "shoot out" of the storage unit in his truck. Spikner informed

Rozier that he had never known Smith to park a vehicle inside the storage unit prior to that day.

At approximately 11:30 a.m., Smith visited an auto pawn shop and attempted to sell two of the dump trucks he used in his construction business; Smith explained to the pawn dealer that he was planning to leave town. Smith and the pawn dealer agreed that Smith would return later in the day to complete the deal.

At approximately 2:30 p.m., Smith encountered Lee Ferguson at Turfway Park, in Kentucky. Ferguson and Smith were acquainted and often saw each other at Turfway Park while betting on horses. Smith asked Ferguson whether he could have a ride back to Cincinnati; Ferguson agreed. At approximately 3:45 p.m., they left Turfway Park and headed back to Cincinnati. Smith directed Ferguson to stop at the Roselawn storage unit, where he retrieved two suitcases. He put the suitcases in the back of Ferguson's van and directed Ferguson to drop him off at the auto pawn shop. While en route, Smith asked Ferguson if he would like to buy his truck. He explained to Ferguson that he no longer needed the truck because he was planning to leave town. At approximately 4:30 p.m., Smith arrived at the auto pawn shop, where the police apprehended him. The police then retrieved his suitcases from Ferguson's van. Analysis later revealed that clothing within the suitcases contained gunshot residue. In addition, the police subsequently located Smith's truck in the parking lot at Turfway Park. One of the keys on the key ring that had been found at the scene of the murder was determined to operate the ignition of Smith's truck. The murder weapon was never recovered.

After being indicted for the murder of Jenkins, Smith moved to suppress the photo identification and in-court identification by Thomas, arguing that the photo array was unduly suggestive. The trial court denied this motion. Following a jury trial, Smith was found guilty of murder with a gun specification. The trial court sentenced him to serve fifteen years to life, plus three years' actual incarceration on the gun specification. Smith then moved for a new trial and for a judgment of acquittal under Crim.R. 29(A); these motions were also denied.

On appeal, Smith brings seven assignments of error. Because we sustain Smith's first and second assignments of error, we reverse the trial court's judgment.

## II. FIRST AND SECOND ASSIGNMENTS

In his first and second assignments of error, Smith argues that the trial court erred in overruling his motions for a mistrial and a new trial because the prosecuting attorneys, by their misconduct during closing argument, violated his constitutional rights by depriving him of a fair trial.

 Generally, the conduct of a prosecuting attorney cannot be made a ground of error unless the conduct deprived the defendant of a fair trial.[1] Under Ohio law, the test for whether prosecutorial misconduct may serve as the basis for reversing a conviction is first whether the prosecutor's remarks were improper, and, if so, whether they prejudicially affected substantial rights of the accused.[2] Smith complains of four instances of misconduct, all of which occurred during closing argument. We examine each of these alleged instances in turn,[3] keeping in mind that despicable behavior and terrible crimes do not preclude the duty to zealously protect the substantial constitutional rights of those accused of such offenses. We observe that the senselessness, cruelty, and abhorrence of crimes periodically incenses even experienced and capable prosecutors beyond constitutional and professional control. While this is understandable, it should not be permitted to denigrate the cherished constitutional requirement of fair trial. We take no pleasure in applying the standard in such cases, and do so not as zealots, but pursuant to our sworn duty to uphold constitutional protections.

## A. ALIBI COMMENT

 Smith takes issue with the prosecutor's comment during closing argument regarding his lack of an alibi:

"Let's think about what you have heard in this case and the evidence that you have heard. And I have a list * * * first of all, we have a lady who made a very good identification. * * *

"But what happens then, the police start to investigate, and they find another man who happens to have seen a person who looked like this person with the victim minutes before the victim was killed. The odds go up a little bit, don't they? Get a little better. * * *

"And then we have item number three. Mr. White says Mr. Jenkins wouldn't pick anybody up in the truck unless it was about business, a business partner, businessman, business. Odds go up a little bit more.

"Then the witness, and this is pretty important, because *the witness has picked somebody who doesn't have an alibi.*" (Emphasis added.)

---

1. *State v. Maurer* (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 402–403, 473 N.E.2d 768, 793.

2. *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, 300; *State v. Hart* (1994), 94 Ohio App.3d 665, 671, 641 N.E.2d 755, 759.

3. While we have reviewed these alleged instances of prosecutorial misconduct in the context of the entire case, for convenience we present our analysis of each of these instances separately.

Defense counsel immediately objected to this comment; the objection was sustained by the trial court. At sidebar, defense counsel moved for a mistrial, arguing that the prosecutor had improperly commented on Smith's failure to testify and had improperly shifted the burden of proof. The trial court denied defense counsel's motion for a mistrial and then brought the jury back without giving any curative instruction.

Initially, we must determine whether the remark in question was, in fact, a comment adversely directed to Smith's decision not to testify. Such comments are, of course, prohibited by the Fifth Amendment.[4] The answer to this question, under the facts of this case, is that the prosecutor's alibi comment *was* adversely directed to Smith's decision not to testify. This conclusion is required because the prosecutor knew that Smith had told the police that he could not corroborate an alibi and also knew that Smith had not filed a notice of alibi, and thus had nothing to offer as testimony in his defense against evidence of his guilt. The state argues that the comment was meant to say that the state's evidence was strong, but that is not what was said. The prosecutor said that "somebody," *i.e.*, the defendant Smith, "doesn't have an alibi." The law derives intention from the results of words or actions. It is natural to conclude that the intention of such language was to underscore Smith's failure to testify and his silence as to an alibi. A reasonable juror could conclude that if Smith had an alibi he would not remain silent. The words spoken have a plain meaning, and we cannot speculate that they were intended to mean something not said.

We further determine that the alibi comment may very well have created the belief in the minds of the jury that the defense had a burden of proof on the matter of alibi, particularly with no curative instructive from the trial judge.

## B. DENIGRATION OF DEFENSE COUNSEL

■ The second instance of prosecutorial misconduct of which Smith complains relates to the prosecutor's denigration of defense counsel. The following comments were made by the prosecutor during closing argument:

"Mr. Burlew is a very nice man. He's one of the best criminal lawyers in Cincinnati. And I say that and I mean it, and I respect him greatly. *And he's really, really good at making, and maybe you've heard the term before, chicken salad out of chicken—fill in the blank.* Maybe you've heard it before. Maybe you haven't. And he's done a superb job at doing that. Okay?

---

4. *Griffin v. California* (1965), 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106; *State v. Clark* (1991), 74 Ohio App.3d 151, 156, 598 N.E.2d 740, 743.

"And I can't emphasize to you enough, because he got up here at closing argument and he was arguing that I was going to attack him, and we're going to attack the lawyer because we don't have any evidence, so on and so forth; and I apologize to him ahead of time because I am going to attack him. I have to. He's put me in the position where I can do nothing else, *because he has tried the whole case not by evidence, but by his speeches and misrepresentations.*" (Emphasis added.)

· The following then took place in the jury's presence: defense counsel immediately stated to the trial court, "I demand an apology * * * [a]nd I demand a reprimand from you to this jury certifying to them that I have violated no canon, none of your admonitions in this case"; the trial court suggested that an apology was appropriate; the apology was made by the prosecutor; it was accepted by defense counsel; and the trial court then admonished the prosecutor, stating that "we're going to turn our attention to the evidence in this case and not upon personal nature of counsels; we are, aren't we?"

■ As this court stated in *State v. Hart*,[5] our adversarial system permits and even encourages prosecutors to argue fervently for conviction. Accordingly, courts have consistently recognized that the prosecution is entitled to wide latitude and freedom of expression during summation in discussing what the evidence has shown and what reasonable inferences may be drawn therefrom.[6] Thus, the prosecutor was clearly entitled in this case to comment on the testimony and to suggest the conclusions to be drawn from it.[7] He was also free to highlight the relative strength of the prosecution's case and relative weakness of the defense.

■ The latitude afforded the prosecution does not, however, extend so far as to permit the prosecution to denigrate the role of defense counsel.[8] The prosecutor's comments in this case, in effect, suggested to the jury that defense counsel had intentionally deceived the jury by engaging in misrepresentations. As we stated in *Hart:*

"A prosecutor may argue and argue ardently that the evidence does not support the conclusion postulated by defense counsel. A prosecutor may not, however, denigrate the role of defense counsel by injecting his personal frustra-

---

5. 94 Ohio App.3d at 671, 641 N.E.2d at 759.

6. *Id.*, citing *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, 53 O.O.2d 182, 185, 263 N.E.2d 773, 777.

7. *Maurer, supra.*

8. *Hart, supra; State v. Keenan* (1993), 66 Ohio St.3d 402, 406, 613 N.E.2d 203, 207.

tion with defense tactics * * *. * * * The prosecutor was not entitled to employ * * * argument to denigrate the role of defense counsel and to insinuate to the jury that [the defendant] and his counsel, by exercising their right to suggest what conclusions may or may not have been drawn from the evidence found at trial, were seeking to hide the truth." [9]

We cannot subscribe to the state's argued exculpation of such conduct. Rather, we agree with defense counsel that this personal attack was completely baseless and improper, and constituted error. Furthermore, it had the dangerous potential of tainting the jury's view of Smith's defense.

Aside from the crude analogy pertaining to the ingredients of chicken salad, which was inappropriate to the dignity of trial, we are intuitively and legally repulsed by the prosecutor's purposeful attack statement that defense counsel personally tried the case by misrepresentations. The quotation from *State v. Hart, supra,* applies to the matter *sub judice* like a poured mold; this admitted personal attack was completely improper and rises to the level of constitutional error. Further, under the facts of this case, prejudice to a fair trial is not removed by a court-extracted apology, evidence of guilt, and a court instruction that statements made by counsel are not evidence. Nor can we subscribe to the argument that the trial court tacitly acknowledged that there was no misconduct. Why would defense counsel and the trial judge demand an apology, but for misconduct? The effect on the jury of this personal denigrating attack by the prosecution upon defense counsel, alleging misrepresentations, was akin to invasive radioactive fallout that could not be totally eradicated.

### C. BAD CHARACTER

Third, Smith contends that he was prejudiced by the following statement made by the prosecutor during closing argument:

"You heard it all. The guy she picks, all of a sudden being desperate for money, decides to take his car to Kentucky and abandon it. Why did he do that? He wants to leave the car in Kentucky, he needs cash, he leaves the car in Kentucky. And then the same guy that she picks tries to sell it for 500 bucks to Ferguson.

" * * *

"So one minute he's a local long-time businessman, and then the next minute the guy that she sees, he's going to leave town, is trying to get some quick cash, he's trying to get three grand above his pawn from the pawning place, he's desperate for money, he doesn't even know where he's going. And that's the

---

**9.** 94 Ohio App.3d at 673–674, 641 N.E.2d 755, 760.

same guy that she picked out of the lineup. The odds have gotten greater and greater and greater and greater.

"She—the guy that she picks has got his bags packed, he's ready to go. He packs his bags and he puts them in a van. When he's arrested, he's ready to go. Is that a coincidence? *Are these things all a coincidence that she picked the wrong person, and just so happened to pick a person that has all of these indicia of criminal behavior running around in his life?* Is that an accident? A coincidence?" (Emphasis added.)

According to Smith, this statement was an attempt to suggest to the jury that he had a bad or criminal character.

As Smith correctly contends, it is improper for a prosecutor to encourage the jury in closing argument to convict a defendant on the basis of his bad character.[10] However, with the instant statement viewed in its appropriate context, it is clear that the prosecutor was not insinuating that Smith had a bad or criminal character. Rather, the comment was a reference to evidence presented at trial relating to Smith's activities on the day of the murder. As we have stated previously in this decision, it is entirely proper for the prosecutor to comment on the evidence and to suggest the conclusions that may be drawn therefrom. In our opinion, that is all that the prosecutor did in this instance. Accordingly, the prosecutor committed no error in making the statement, and the trial court properly overruled defense counsel's objection.

## D. REFERENCE TO MATERIAL OUTSIDE THE RECORD

The final instance of prosecutorial misconduct cited by Smith relates to the prosecutor's quotation, during closing argument, from a portion of the transcript of the pretrial suppression hearing, which had not been entered into evidence at trial. Smith argues that these references to material outside the record were in violation of his due process rights and necessitate the reversal of his conviction. We disagree.

It is a prosecutor's duty in closing argument to avoid efforts to obtain a conviction by going beyond the evidence that has been presented to the jury.[11] Therefore, references by a prosecutor during closing argument to material outside the record normally constitute error and may serve as the basis for reversal when the error is prejudicial to the defendant. Under the unique facts

---

10. *State v. Hudson* (1993), 86 Ohio App.3d 113, 117, 619 N.E.2d 1190, 1192.

11. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318–319, 470 N.E.2d 883, 885.

of this case, however, we are unable to conclude that the prosecutor's remarks prejudiced Smith.

A pretrial hearing had been held on Smith's motion to suppress Thomas's identification testimony. During this hearing, defense counsel asked Thomas whether the police had indicated to her, prior to her viewing of the photo array, that a suspect had been arrested. Thomas answered in the negative. At trial, while cross-examining Thomas, defense counsel briefly referred to this portion of the transcript from the suppression hearing in an effort to impeach Thomas by demonstrating that her statements at trial were in conflict with her prior statements. Our reading of the record leads us to conclude, however, that Thomas's statements at trial were *not* inconsistent with her pretrial statements. In both instances, she stated that the police had not informed her that they had a suspect in detention before she viewed the photo array. During his closing argument, defense counsel referred back to his effort to impeach Thomas on cross-examination. In summarizing this exchange, defense counsel left the impression that, on cross-examination, Thomas had contradicted her prior testimony by stating that police *did*, in fact, inform her that a suspect was in custody before she viewed the photo array. In our opinion, this summary mischaracterized the record. Furthermore, the record demonstrates that the prosecutor's subsequent references to the pretrial transcript were solely for the purpose of correcting defense counsel's mischaracterization. Under these circumstances, we are unable to conclude that these references by the prosecutor deprived Smith of a fair trial.

## III. THIRD ASSIGNMENT

In his third assignment of error, Smith asserts that the trial court erred by overruling his motion to suppress his pretrial identification and, consequently, his in-court identification by Thomas. This assignment is not well taken.

Before identification testimony may be suppressed, the trial court must find that the procedure employed was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification.[12] Reliability is the linchpin in determining the admissibility of identification testimony, and even if the identification procedure itself is suggestive, so long as the challenged identification itself is reliable, it is admissible.[13]

Smith's challenge to the identification procedure employed below falls into two categories. First, Smith contends that the photo array was unduly suggestive

---

**12.** *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401.

**13.** *Manson v. Brathwaite* (1977), 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140.

because Smith's photo was the only one of the six depicting a man in his forties with a mixed gray and black beard. We have reviewed the photo array, however, and conclude that it was not impermissibly suggestive.

Smith's second challenge to the identification procedure concerns Thomas's ability to identify the suspect. Specifically, Smith asserts that the identification was unreliable because of Thomas's limited opportunity to view the suspect.

The factors to be considered in assessing the reliability of an identification include the opportunity of the witness to view the suspect, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at confrontation, and the length of time between the sighting and the confrontation.[14] The record in this matter demonstrates that Thomas had the opportunity to observe Smith as he ran past her in broad daylight. Furthermore, she provided police with a detailed description that proved to be highly accurate with the possible exception of her underestimation of Smith's height. Finally, Thomas observed the photo array within hours of the sighting and demonstrated a high degree of certainty when she selected Smith as the person that she had sighted. Thus, even if we had concluded that the photo array was suggestive, taking into consideration the totality of the circumstances in this case, we cannot say that Thomas's identification was unreliable. Accordingly, Smith's third assignment of error is overruled.

## IV. FOURTH AND SIXTH ASSIGNMENTS

In his fourth and sixth assignments of error, Smith challenges the sufficiency of the evidence supporting his conviction, as well as the trial court's denial of his Crim.R. 29(A) motion for acquittal. In support of these two assignments, Smith puts forth one argument: that the state failed to prove the identity of the perpetrator beyond a reasonable doubt.

## A. SUFFICIENCY OF THE EVIDENCE

Whether evidence is sufficient to support a conviction is a question of law.[15] When considering whether the evidence was sufficient to support a conviction, an appellate court must review the evidence in the light most favorable to the state, and the question to be answered is whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[16]

---

14. *Neil, supra.*

15. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546.

16. *Id.; State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

After reviewing the record, we conclude that the state's evidence, including Thomas's identification testimony, if believed (as it apparently was), provided a sufficient basis for concluding that Smith was the perpetrator. Accordingly, Smith's assertion that the state offered insufficient evidence to prove the element of identity beyond a reasonable doubt is without merit. Thus, his fourth assignment of error is overruled.

### B. MOTION FOR ACQUITTAL

Because a Crim.R. 29(A) motion for acquittal challenges the sufficiency of the evidence adduced at trial in much the same manner as does an assertion that there was insufficient evidence to sustain a conviction,[17] the foregoing resolution of Smith's challenge to the sufficiency of the evidence is also dispositive of this issue. Accordingly, we conclude that the trial court did not err in refusing to grant Smith's motion for acquittal. Thus, we overrule his sixth assignment of error.

### V. CONCLUSION

Our resolution of the foregoing assignments of error renders Smith's remaining assignments of error, the fifth and the seventh, moot. Therefore, we do not address them. We reverse the judgment of the trial court and remand this cause for further proceedings.

*Judgment reversed*
*and cause remanded.*

MARIANNA BROWN BETTMAN, J., concurs.

SUNDERMANN, P.J., dissents.

SUNDERMANN, Presiding Judge, dissenting.

I, too, am disturbed by the conduct of the prosecution in this case. However, given the specific circumstances of this case, and most significantly the overwhelming evidence of Smith's guilt, I am unable to conclude that this conduct necessitates a reversal of Smith's murder conviction. Therefore, I respectfully dissent. My reasoning is as follows.

---

17. When a motion to acquit under Crim.R. 29(A) has been overruled by a trial court, the question for a reviewing court is whether, viewing the evidence in the light most favorable to the state, a reasonable mind might fairly find each element of the offense proven beyond a reasonable doubt. *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus.

## ALIBI COMMENT

Smith argues that, because alibi could only be proven in this case by putting him on the stand,[18] the prosecutor's reference to alibi directed the jury's attention to the fact that Smith had failed to testify and also gave the jury the impression that the defense was required to prove alibi. I cannot agree.

The question is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." [19] Based on my review of the record, I cannot conclude that the prosecutor intended his statement, or that the jury would have naturally and necessarily interpreted the prosecutor's statement, as a comment on Smith's silence. Rather, I conclude that the comment was directed to the strength of the state's evidence.

Smith's argument focuses on the fact that the prosecution knew that there was no way for him to present an alibi defense other than if he took the stand himself. This is true because Smith told police, when his statement was taken following his arrest, that he had been alone at the time of the murder. Thus, Smith could offer no witness, other than himself, to testify as to his whereabouts. Because the prosecutor was aware of this, Smith argues that the prosecutor's remark can only be interpreted as a reference to his failure to take the stand. While I agree that the prosecutor must have been aware of Smith's statement to the police, I do not believe that this fact alone establishes that the prosecutor intended the remark as a reference to Smith's silence. Rather, given that the jury did not know of Smith's statement to police or its contents, and given that the prosecutor did not explicitly mention Smith's failure to testify or imply that the jury should take a position based on his silence, I conclude that the prosecutor did not intend that this remark be interpreted as, nor could the jury have naturally and necessarily taken the remark as, a comment of Smith's silence. It is more likely that the prosecutor's remark was intended to highlight that the defense had failed to rebut the testimony of the state's witnesses, a purpose that is clearly permissible.[20] Thus, the comment did not violate Smith's Fifth Amendment privilege against self-incrimination.

---

**18.** In his statement to the police, Smith claimed that at the time of the murder, he had been by himself in Lincoln Heights, but not at the scene of the murder. Further, defense counsel filed no notice of an alibi defense prior to trial.

**19.** *Knowles v. United States* (C.A. 10, 1955), 224 F.2d 168, 170, quoted in *State v. Cooper* (1977), 52 Ohio St.2d 163, 173, 6 O.O.3d 377, 383, 370 N.E.2d 725, 733, vacated in part on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1157.

**20.** *State v. Ferguson* (1983), 5 Ohio St.3d 160, 162, 5 OBR 380, 383, 450 N.E.2d 265, 267; *State v. Webb* (1994), 70 Ohio St.3d 325, 329, 638 N.E.2d 1023, 1028–1029.

Additionally, I do not believe that the prosecutor's single reference to alibi would have led the jury to believe that the defense bore the burden of proof on this issue. Furthermore, any potential confusion on the part of the jury was cured by the trial court's general charge that the burden of proof rested solely on the prosecution.

Accordingly, I conclude that the prosecutor's reference to alibi, though perhaps imprudent, was not improper in its full context and, accordingly, did not constitute error.

## DENIGRATION OF DEFENSE COUNSEL

Although I agree that the prosecutor's improper personal attack constituted error, because (1) the trial court immediately required the prosecutor's apology, admonished him for his behavior,[21] and tacitly acknowledged that defense counsel had not engaged in misconduct; (2) the jury was instructed that the attorneys' statements during closing argument were not evidence; and, most important, (3) the evidence of guilt [22] properly before the jury was overwhelming, I am unable to conclude, as the majority does, that Smith was prejudiced by these improper comments.

Accordingly, I would affirm the trial court's judgment.

---

**21.** See *Hart,* 94 Ohio App.3d at 674, 641 N.E.2d at 760 (concluding that prosecutor's improper denigration of defense counsel was cured by prosecutor's apology and trial court's remedial action).

**22.** But, see, *Keenan,* 66 Ohio St.3d at 411, 613 N.E.2d at 210 (concluding that *without* overwhelming evidence of guilt, and in the absence of remedial action by the trial court, it could not be held that prosecutor's misconduct during closing argument did not result in prejudice to the defendant).