DECISION.
{¶ 1} On June 17, 2005, we affirmed the conviction and sentence of defendant-appellant Sanford Roberts. We subsequently noticed an error in the opinion with regard to Roberts's sentence. Accordingly, we vacate our June 17, 2005, decision in its entirety and replace it with this decision affirming his conviction and sentence.
 {¶ 2} In the late afternoon hours of May 16, 2003, Njaga Faal was shot in the chest and robbed of at least $3000 outside of 1207 West Galbraith Avenue in Cincinnati. Faal saw a man with braids put a handgun in his face, and he saw four or five men rush him, but he did not know which of his assailants had shot him.
 {¶ 3} An eyewitness heard the gunshot and saw a black Honda automobile waiting to pull out of a parking lot next to the scene of the shooting. Three men were in the car, and a light-skinned black man with a goatee was entering the rear driver's side door, rushing to stuff something in the car. After this fourth man entered, the car sped away.
 {¶ 4} The eyewitness called 911 and described the car and its direction of flight to the police. The police pursued the Honda and pulled it over several miles from the scene of the shooting. Defendant-appellant Sanford Roberts was seated behind the driver. Neil Wynn was driving, Martinez Terry was sitting in the front passenger seat, and Antonio Stonestreet was in the back seat behind Terry. As the suspects were exiting from the car, money was literally falling out the doors.
 {¶ 5} Inside the Honda, the police found $340, clothing, duct tape, a purple latex glove stuffed in the pocket behind the driver's seat, and two guns. One gun, a 9-mm handgun, was found on the floorboard where Terry had been seated. The second gun, a.45 caliber, was found on the floorboard near where Roberts had been seated. The gun's magazine, containing eight cartridges, was found in the pocket behind the driver's seat with the purple glove. A ballistics examination by a firearms expert matched the .45-caliber automatic to a shell casing found at the scene of the shooting. But without a bullet, the expert could not definitely say that the recovered .45-caliber gun had been used to shoot Faal. The firearms expert also test-fired both weapons recovered in the Honda and testified that they were both operable.
 {¶ 6} After they were searched, the police found $920.01 on Roberts, $5,002.01 on Stonestreet, and $841.91 Wynn. $1,006 was found in the interview room that Terry had been placed in, money that had not been there prior to Terry's arrival. The police also found a purple latex glove in Terry's pants' pocket and a flattened roll of duct tape in Stonestreet's pocket.
 {¶ 7} As a result of the gunshot wound, Faal very nearly died. He has had several surgeries to remove his spleen and part of his intestines, and he will have to have future surgeries.
 {¶ 8} The police interviewed Faal in the hospital a few days after the shooting. Faal identified Terry out of a six-man photographic array and said that Terry was the man who had put the handgun in his face. He did not know if Terry had shot him because after he saw the gun, he was told to lie down and he struggled with the assailants, hitting one in the temple. He then heard a gunshot and noticed that he had been shot in the chest.
 {¶ 9} Faal also identified Roberts as an assailant after viewing a six-man photographic array. He was not able to positively identify Stonestreet or Wynn at that time. But at trial he positively identified Terry, Roberts, Stonestreet, and Wynn as his assailants.
 {¶ 10} Roberts, Terry, Stonestreet, and Wynn were indicted by the Hamilton County Grand Jury on counts of aggravated robbery, robbery, and felonious assault with firearm specifications. Roberts and Terry were also charged with having a weapon under a disability, and Terry was additionally charged with receiving stolen property. The four defendants were tried together. Wynn was acquitted, but Roberts, Terry, and Stonestreet were found guilty on all counts.
 {¶ 11} Roberts was sentenced to 30 years' incarceration. He appeals from his conviction and sentence, raising five assignments of error. After a thorough review of the record, we affirm.
 {¶ 12} In his first assignment of error, Roberts argues that the trial court erred in overruling a Batson challenge during voir dire. We disagree.
 {¶ 13} During voir dire, the prosecutor had already excluded four African-American jurors with peremptory challenges when she challenged a fifth African-American, juror Burns. Roberts, who is African-American, objected, relying on Batson v. Kentucky.[1] In Batson, the Supreme Court held that purposeful discrimination in the use of peremptory challenges to exclude members of a minority group violates the Equal Protection Clause of the United States Constitution.
 {¶ 14} The trial court held a sidebar conference and asked the state to give a race-neutral explanation for the challenge. The state expressed two reasons for excluding Burns. First, Burns's responses indicated that she did not feel the police would provide an adequate response to her reporting of a crime and that she had a "street justice mentality." Second, Burns stated her belief that there was different treatment under the law based upon a person's race and socioeconomic background. The trial court found this explanation race-neutral and overruled the Batson
challenge.
 {¶ 15} A Batson claim for purposeful discrimination in juror selection encompasses three steps. First, a defendant must establish a prima facie case of purposeful discrimination by demonstrating that members of a cognizable racial group have been peremptorily challenged, and that the facts and any other relevant circumstances raise an inference that the prosecutor has used the challenges to exclude jurors because of their race.[2] Once this burden is met, the state must then provide a race-neutral explanation for the striking of a particular juror.[3] If the state puts forth a race-neutral explanation, the trial court must then decide, on the basis of all the circumstances, whether the defendant has proved purposeful racial discrimination.[4]
 {¶ 16} Roberts submits that the prosecutor's explanation was not race-neutral, but a self-serving comment not supported by the questioning. He cites Burns's indication to the prosecutor that "she hoped she would be able to separate her feelings that race and socioeconomic class go into this [disparate treatment under the law]."
 {¶ 17} The race-neutral explanation given by the prosecutor during aBatson challenge does not need to rise to the level justifying a challenge for cause.[5] We will not reverse a trial court's finding of no discriminatory intent unless the finding was clearly erroneous.[6]
 {¶ 18} The facts of this case support the state's explanation. When asked by the prosecutor whether she believed "that all people are allowed to have equal protection of the laws?" Burns replied, "I believe it is allowed. I don't believe that it happens." She went on to say that there was different treatment under the law based upon "race and economic background." When the prosecutor tried to explore Burns's attitude toward the police after she was the victim of three burglaries, Burns said that she "dealt with [her burglaries] on [her] own" and did not report them because "it would be a waste of time." She said, "I took care of it myself. * * * I called some people that I knew and told them what was taken and I got it back."
 {¶ 19} In light of Burns's comments, we hold the trial court did not err in accepting the prosecutor's race-neutral explanation for the challenge. Accordingly, we overrule the first assignment of error.
 {¶ 20} In his second assignment of error, Roberts argues that the prosecutor made improper comments during closing argument, depriving him of a fair trial.
 {¶ 21} If a comment by the prosecutor was improper, we must determine whether it was so prejudicial that it denied Roberts a fair trial. In doing so, we must examine the comment in the context of the entire trial, and in the context of the closing argument as a whole.[7]
 {¶ 22} Roberts argues that the prosecutor made an improper comment about the connection between the .45-caliber weapon found in the Honda and the shell casing found at the scene of the shooting. She said in closing, "[Mr. Harris] never mentions the gun, the gun that shot Njaga Faal that left the shell casing that matches this gun that was at the floor board of the Honda that sped away from the scene that was at [Roberts's] feet." After an objection, the prosecutor again said, "I'm sorry, the casing matches this gun." The trial court then informed the jury, "[G]reat latitude is given to the attorneys. As long as they don't misstate the evidence, they are allowed to comment upon the evidence and draw their conclusions, but the ultimate conclusions must be drawn by you, the ladies and gentlemen of the jury."
 {¶ 23} Commentary in closing argument must be based upon the evidence. Generally, the state may comment freely on "* * * what the evidence has shown and what reasonable inferences may drawn therefrom."[8]
 {¶ 24} The evidence demonstrated that a single shell casing had been found near where Faal had been shot and that this casing had been fired from the .45-caliber gun found in the back seat of the Honda. The bullet that wounded Faal was never found, and the firearms expert never testified that the .45-caliber gun found in the Honda was used to shoot Faal. But the jurors were free to infer that the .45-caliber shell casing found at the scene of the shooting encased the bullet that injured Faal. The prosecutor's comment on this evidence and the inference to be drawn from it was a little unclear, but she clarified her point after the objection by stating that the "casing matches the gun."
 {¶ 25} The comment, based upon the evidence presented and a reasonable inference from that evidence, was not improper.
 {¶ 26} Roberts also cites a passage in closing argument where the prosecutor, without objection, stated the following:
[E]ach attorney determines which area they want to attack. Like spin doctors for a politician, it's their job to highlight the positives and ignore the negatives with respect to their client. That's their job. And that's fine; but I remind you that nothing that comes out of their mouths is evidence.
* * *
As for Mr. Roberts, Mr. Harris gave you a specific story about this drug deal gone bad. Make a great show for NYPD or Law and Order. But it's not evidence, you can't consider it. Makes you wonder where thatinformation came from." (Emphasis added by Roberts.)
 {¶ 27} Roberts argues that this statement denigrated Roberts's defense counsel, Rodney Harris, and insinuated that his trial strategy was designed to confuse or mislead the jury. The state argues that the prosecutor was merely commenting permissibly on the lack of evidence to support the defense's theory of the case.
 {¶ 28} While courts have consistently recognized that the prosecution has a great degree of latitude in closing argument, this latitude does not extend so far as to permit the denigration of defense counsel.[9]
By naming Mr. Harris and adding the accusatory question "[Makes] you wonder where that information came from?", the prosecutor came close to crossing the line separating permissible comment on the weakness of the defense and impermissible personal attack on the integrity of counsel.
 {¶ 29} Even if we were to conclude that the comment was improper, there was no objection to the comment, and the evidence against Roberts was substantial. After viewing the comment in the context of the entire trial and closing argument as a whole, we cannot say that this one comment rose to the level of plain error and affected the outcome of the trial.[10]
 {¶ 30} Accordingly, the second assignment of error is overruled.
 {¶ 31} In his third assignment of error, Roberts argues that the trial court erred by refusing the jury's request during deliberations for a reading of trial testimony. We disagree.
 {¶ 32} During jury deliberations, the court received a question from the jury asking, "What is the relationship of the black Honda's owner to the defendants." After discussing the question with the attorneys for the defendant and the state, the court instructed the jurors to rely on their collective recollection of the testimony. The foreperson then asked the court if the jurors could have a transcript so that they could review the issue. The court denied the request, stating that it would be almost an impossibility to have a transcript from the lengthy trial prepared for deliberations.
 {¶ 33} The question of whether to reread testimony to the jury during its deliberations is left to the sound discretion of the trial court.[11]
We find no abuse of discretion in the trial court's refusal to reread testimony to the jury. Accordingly, the third assignment of error is overruled.
 {¶ 34} In his fourth assignment of error, Roberts challenges the sufficiency and weight of the evidence supporting his convictions for aggravated robbery with a three-year firearm specification, robbery, felonious assault, and having a weapon under a disability.
 {¶ 35} In reviewing the record for sufficiency, we must determine whether any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution.[12] A review of the manifest weight of the evidence puts the appellate court in the role of a "thirteenth juror."[13] We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[14] A new trial should be granted only in exceptional cases where the evidence weighs heavily against conviction.[15]
 {¶ 36} The state presented more than sufficient evidence to convict Roberts. Faal was accosted, shot, and robbed of money. He suffered life-threatening injuries. He positively identified Roberts as one of his assailants shortly after the shooting and again at trial. A 911 caller described a man fitting Roberts's description stuffing something into the back seat of a black Honda immediately after the shooting. After Roberts entered the Honda, the driver sped off. The police stopped the Honda several minutes later and apprehended the occupants. Roberts, who had been sitting in the rear passenger seat, was carrying over $900. The police found a .45-caliber gun on the floorboard where Roberts had been sitting. They also found the gun's magazine and a purple latex glove stuffed into the pocket behind the driver's seat. The state presented testimony demonstrating that the only casing found at the scene of the shooting came from the .45-caliber gun found in the back of the car. The state also presented evidence that both weapons found in the Honda were operable.
 {¶ 37} In light of this evidence, we hold that the state presented more than sufficient evidence to convict Roberts of aggravated robbery[16] with a firearm specification,[17]
robbery[18] and felonious assault.[19] Further, Roberts stipulated at trial to having a prior drug conviction. This stipulation and the evidence presented at trial sufficently supported Roberts's conviction for having a weapon under a disability.
 {¶ 38} Finally, after weighing the evidence and considering the credibility of witnesses, we cannot say that the jury lost its way and created a manifest miscarriage of justice. The assignment of error is overruled.
 {¶ 39} In his final assignment of error, Roberts challenges his sentence. Roberts was found guilty on one count of aggravated robbery with firearm specifications, one count of robbery, two counts of felonious assault with firearm specifications, and one count of possessing a firearm under a disability. The court imposed maximum terms and merged the firearm specifications into one three-year term to be served prior to the ten-year term imposed for aggravated robbery. The court imposed consecutive terms on all counts except the robbery count and ordered Roberts to serve a thirty-year term of incarceration.
 {¶ 40} Roberts challenges the trial court's imposition of maximum terms on two separate grounds. First, he argues that the imposition of the maximum terms violated Ohio's sentencing statutes. Second, citingBlakely v. Washington,[20] he argues that the imposition of maximum terms violated his Sixth Amendment right to have any fact not admitted to but essential to his punishment submitted to a jury and proved beyond a reasonable doubt. Roberts argues that the sentence in this case violated the holding in Blakely because the court's impositon of the maximum was based upon its own finding that Roberts had committed "the worst form of the offense[s]" and "pose[d] the greatest likelihood of recidivism."
 {¶ 41} We hold that the court did not err in imposing maximum terms of incarceration. The court made the relevant statutory findings on the record,[21] and we cannot clearly and convincingly find that the record does not support the findings or that those findings were contrary to law. Further, the court based its recidivism finding upon Roberts's significant "adult and felony" convictions. We have held that Blakely
permits the fact of a prior conviction to support an enhanced sentence.[22] Under these facts, where the court imposed the maximum on a finding of recidivism expressly due to prior convictions, the sentence did not violate Roberts'sSixth Amendment rights.
 {¶ 42} The court's alternative basis for imposing the maximum, that Roberts had committed "the worst form of the offense," violated Blakely,
but this error was harmless in light of the court's articulation of a separate, legitimate ground to support the imposition of the maximum.[23]
 {¶ 43} Roberts also argues that the trial court erred in imposing consecutive terms of incarceration. We disagree.
 {¶ 44} The court found consecutive terms "appropriate" and "necessary" to fulfill the purposes of the sentencing statutes, because the harm caused to the victim was great and unusual and Roberts had a lengthy and significant criminal record. The court made the relevant statutory findings on the record,[24] albeit in different language, and we cannot clearly and convincingly find that the record does not support the findings or that those findings were contrary to law. Further, we have held that the Blakely restrictions do not apply to the imposition of consecutive sentences for multiple crimes.[25]
 {¶ 45} Finally, Roberts cites as error the court's imposition of consecutive prison terms for two felonious assaults. Although he was convicted of violating R.C. 2903.11(A)(1) and 2903.11(A)(2), he argues that the crimes involved only one victim at one place and time, and, therefore, that the crimes should have been merged as allied offenses of similar import.
 {¶ 46} In State v. Coach,[26] we held that convictions under R.C.2903.11(A)(1) and 2903.11(A)(2) do not involve allied offenses of similar import, after applying the objective comparison-of-the-elements test set forth by the Ohio Supreme Court in State v. Rance.[27] We reject Roberts's argument on this authority.
 {¶ 47} Accordingly, we hold that the trial court did not err by imposing maximum consecutive sentences in this case, and we overrule the fifth assignment of error.
 {¶ 48} Finding no merit to the assigned errors, we affirm the judgment of the trial court.
Judgment affirmed.
Hildebrandt, P.J., Sundermann and Hendon, JJ.
[1] (1986), 476 U.S. 79, 106 S.Ct. 1712.
[2] State v. Hill, 73 Ohio St.3d 433, 444-445, 1995-Ohio-287,653 N.E.2d 271.
[3] State v. Herring, 94 Ohio St.3d 246, 255-256, 2002-Ohio-796,762 N.E.2d 940.
[4] Id. at 256.
[5] State v. White, 85 Ohio St.3d 433, 1999-Ohio-281, 709 N.E.2d 140.
[6] Hill at 445.
[7] State v. Hart (1994), 94 Ohio App.3d 665, 641 N.E.2d 755.
[8] State v. Lott (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293.
[9] See State v. Smith (1998), 130 Ohio App.3d 360, 369,720 N.E.2d 149.
[10] See State v. Slagle (1992), 65 Ohio St.3d 597, 604-605,605 N.E.2d 916.
[11] See State v. Berry (1971), 25 Ohio St.2d 255, 267 N.E.2d 775, paragraph three of the syllabus.
[12] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[13] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[14] Id.
[15] Id., citing State v. Martin (1983), 20 Ohio App.3d 172,485 N.E.2d 717.
[16] See R.C. 2911.01(A)(1).
[17] See R.C. 2941.145.
[18] See R.C. 2911.02(A)(2).
[19] See R.C. 2903.11(A)(1) and 2903.11(A)(2).
[20] (2004), 542 U.S. 296, 124 S.Ct. 2531.
[21] See R.C. 2929.14(C).
[22] See State v. Lowery, 160 Ohio App.3d 138, 2005-Ohio-1181,826 N.E.2d 340, at ¶ 43; State v. McIntosh, 160 Ohio App.3d 544,2005-Ohio-1760, 828 N.E.2d 138, at ¶ 10.
[23] See Lowery at ¶ 46.
[24] See R.C. 2929.14(E)(4).
[25] See State v. Montgomery, 159 Ohio App.3d 752, 2005-Ohio-1018,825 N.E.2d 250, at ¶ 16-17.
[26] (May 5, 2000), 1st Dist. No. C-990349. See, also, State v.Murray, 156 Ohio App.3d 219, 225, 2004-Ohio-654, 805 N.E.2d 156, at ¶ 19.
[27] 85 Ohio St.3d 632, 1999-Ohio-291, 710 N.E.2d 699.