The STATE of Ohio, Appellee,

v.

ANDERSON, Appellant.

[Cite as *State v. Anderson*, 191 Ohio App.3d 110, 2010-Ohio-6234.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–090897.

Decided Dec. 17, 2010.

111

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Philip R. Cummings, Assistant Prosecuting Attorney, for appellee.

Mary Jill Donovan and Michael P. McCafferty, for appellant.

WILLIAM L. MALLORY JR., Judge.

{¶ 1} Defendant-appellant, Brandon Anderson, appeals from his convictions for murder (with a firearm specification) and having a weapon while under a disability. He challenges on appeal alleged instances of prosecutorial misconduct, the trial court's decision to allow a witness to be recalled for the purpose of allowing that witness to change his testimony, the weight and sufficiency of the evidence to support his convictions, and the trial court's admission of what Anderson asserts was hearsay testimony. For the reasons that follow, we reverse Anderson's convictions and remand the case to the trial court.

## I. Statement of Facts and Procedural Posture

{¶ 2} On the evening of May 7, 2009, Jeremy Nelson and Courtney Turner got into an argument near 845 Findlay Street in downtown Cincinnati. The argument culminated with a highly intoxicated Nelson calling Turner a "bitch." Turner then made telephone calls and sent text messages, some of which were to her brother, Anderson. Soon after, a person arrived and, following a short conversation with Nelson, shot Nelson twice in the chest. The shooter fled and Nelson died at the scene.

{¶ 3} Anderson was arrested and later indicted on two counts of murder, both of which contained two firearm specifications, and one count of having a weapon while under a disability. A jury found Anderson guilty on all counts, and the trial court sentenced Anderson to a term of imprisonment of 15 years to life on the first murder count and to three years' confinement for one of the two firearm specifications in that count. The second firearm specification and the second murder count, along with its two firearm specifications, were merged into the first murder count and its first firearm specification for the purpose of sentencing. The court also imposed a term of three years' incarceration for the weapon-under-disability count. All the sentences were to run consecutively, for an aggregate sentence of 21 years to life incarceration. Anderson now appeals, asserting four assignments of error. To facilitate our discussion, we address his assignments out of order.

## II. Prosecutorial Misconduct

{¶ 4} In his first assignment of error, Anderson alleges that prosecutorial misconduct during the state's closing argument denied him a fair trial. Specifically, Anderson argues that the assistant prosecuting attorney made an improper reference to Anderson's not presenting any evidence concerning an alibi. According to Anderson, this permitted the jury to mistakenly infer that Anderson had the burden to prove that he had an alibi, which reflected negatively on Anderson's decision not to testify. Put another way, Anderson asserts that a

reasonable juror could have logically concluded that if he had an alibi, he would not have remained silent.[1]

{¶ 5} "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant."[2] "[I]t is not enough that there be sufficient other evidence to sustain a conviction in order to excuse the prosecution's improper remarks. Instead, it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found defendant guilty."[3]

{¶ 6} From the trial transcript, it is clear that the assistant prosecuting attorney's comments were not intended to reflect on Anderson's decision not to testify. They were clearly made in response to Anderson's attorney's comments in his opening statement regarding Anderson having a possible alibi and to the defense's failure during the trial to rebut the testimony of any of the state's witnesses. The state was reminding the jury that any possible alibi, as mentioned by Anderson himself in his opening statement, had not been demonstrated. Therefore, Anderson cannot argue that the jury could have "naturally and necessarily" taken the remarks as a comment on Anderson's silence. In addition, Anderson had filed a notice of alibi prior to trial. Taking into account all of these considerations, we conclude that the facts of this case are not comparable to the facts in *State v. Smith*, where the defendant had not filed a notice of alibi and had never mentioned the possibility of one during the trial.[4] The assistant prosecuting attorney's remarks were not improper, and we accordingly overrule Anderson's first assignment of error.

### III. The Hearsay Exception for a Coconspirator's Testimony

{¶ 7} In his fourth assignment of error, Anderson argues that the testimony of prosecution witness Erica Jones was improperly admitted under the hearsay exception for coconspirators.[5] Anderson asserts that for the testimony of a coconspirator to be admissible, the state must present independent proof of a

---

1. *State v. Smith* (1998), 130 Ohio App.3d 360, 720 N.E.2d 149.

2. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883, citing *United States v. Dorr* (C.A.5, 1981), 636 F.2d 117, 120.

3. Id. at 15, citing *United States v. Hasting* (1983), 461 U.S. 499, 510, 103 S.Ct. 1974, 76 L.Ed.2d 96.

4. See *State v. Smith*, 130 Ohio App.3d 360, 720 N.E.2d 149.

5. See Evid.R. 801(D)(2)(e).

conspiracy.[6] Testimony of a coconspirator as to the existence of an alleged conspiracy, in and of itself, is not admissible and may not be used to establish a conspiracy unless the state first makes a prima facie showing of the conspiracy.[7]

{¶ 8} A review of the trial transcript reveals that the state had expected Jones to testify that she had been threatened by Anderson's mother and sister not to testify against him. However, during direct examination, Jones was asked, "Did anybody say anything to you about what would happen if you came in [to testify]?" Jones responded, "No," and that response essentially ended the inquiry on the subject. Despite this, Anderson insists that the state presented evidence through Jones's testimony to demonstrate that there was a conspiracy to cover up the murder. This is clearly not the case. Because Jones never testified about any alleged cover-up of the murder or that anyone had threatened her about her testimony, giving no more than a straightforward denial that such things had occurred, we conclude that there was no hearsay to exclude, and that the trial court could not have erroneously admitted any hearsay. Accordingly, Anderson's fourth assignment of error is overruled.

### IV. The Testimony of Tobias Epps

{¶ 9} In his second assignment of error, Anderson argues that the trial court abused its discretion when it permitted the state to recall its own witness, Tobias Epps, for the sole purpose of allowing him to change his testimony. In considering Anderson's argument, we note that Evid.R. 611 provides that trial courts must exercise "reasonable control over the mode and order of interrogating witnesses." Whether to permit a witness to be recalled for the purpose of giving additional testimony "is a matter committed to the sound discretion of the trial court."[8]

{¶ 10} A review of Epps's testimony reveals that Epps originally testified that he had witnessed a "brown-skinned guy" with a receding hairline fire two shots at Nelson. Epps further testified that he had seen only the shooter's profile. The next day, at his residence, Epps viewed a photographic lineup prepared by the investigating officers. He was shown six photographs and identified two individuals as possible suspects, neither of whom was Anderson. During direct examination, Epps was not asked if Anderson was the person whom he had seen shooting Nelson; however, during cross-examination, when he was asked to look at Anderson's profile, he acknowledged that Anderson's hairline was receding.

---

**6.** *State v. Carter* (1995), 72 Ohio St.3d 545, 550, 651 N.E.2d 965.

**7.** Id.

**8.** *State v. Sims* (1981), 3 Ohio App.3d 321, 329, 3 OBR 375, 445 N.E.2d 235.

{¶ 11} When asked about the photographic lineup during cross-examination, Epps's testimony became more confusing, in part because defense counsel's notes were misplaced and he mistook Epps for another witness. Essentially, defense counsel was asking Epps questions based on his notes for another witness. According to defense counsel, another person had selected the same two photographs that Epps had identified, neither of which was Anderson's photograph. But this person could not be located prior to trial and did not testify. At the end of Epps's testimony, the trial court ordered Epps: "[Do not] discuss your testimony with anyone or allow anyone to discuss it with you until this case is finally closed. That means don't talk about what we said here. Don't tell anybody what anybody asked you. Don't tell anybody what you testified to."

{¶ 12} Immediately after testifying, and contrary to the court's admonition, Epps discussed his testimony outside the courtroom with Cincinnati Police Detective Eric Karaguleff, one of the investigating officers, who had yet to testify in the case. During direct examination, Karaguleff testified that Epps had asked him whether the photographic lineup that Epps had initially looked at after the murder was the same as the lineup shown to him while testifying. Karaguleff told Epps that it should have been, but Epps was insistent that it was not. Karaguleff then took Epps back to the assistant prosecuting attorney to inform him about the situation.

{¶ 13} Over Anderson's objection, the trial court allowed the state to recall Epps. Epps then testified that the photographic lineup that he had initially been shown and the lineup that he was shown while testifying at trial differed. He testified that he had initially been shown five photographs, none of which was Anderson's, but that in court he was shown six photographs, one of which was Anderson's. Epps stated that at that point he became confused; however, when he saw Anderson's profile during cross-examination, something "clicked." He further testified that he had not positively identified Anderson as the shooter because he had never directly been asked to do so. Then, when directly asked if Anderson was the shooter, Epps stated that Anderson was indeed the shooter, and that he was "150 percent" certain of it. Epps's testimony was later contradicted by both Detective Karaguleff and Cincinnati Police Officer David Gregory, who both testified that Epps had initially been shown six photographs, one of which was Anderson's. Both also testified that Epps had never positively identified Anderson from the original photographic lineup.

{¶ 14} Epps's testimony after being recalled is troubling. Whether Epps was initially shown six photographs or five is not particularly significant, because Epps never positively identified Anderson from that photographic lineup. But Epps's insistence that Anderson's photograph was not in the initial lineup that he was shown was, as we have already pointed out, contradicted by both Detective

Karaguleff and Officer Gregory. The only significant change from Epps's initial testimony and his testimony after being recalled was his "150 percent" positive identification of Anderson as the shooter. And this was elicited after he had discussed his original testimony outside the courtroom with the investigating detective who had yet to testify, in violation of the trial court's orders.

{¶ 15} The state argues that even if the trial court abused its discretion in allowing Epps to be recalled, Anderson cannot demonstrate prejudice, because Epps was only one of several eyewitnesses who identified Anderson as the shooter. Specifically, the state points to the testimony of Shandrika Sanders and Erica Jones. However, a close inspection of both Sanders's and Jones's testimony reveals that neither could positively identify Anderson as the shooter.

{¶ 16} Sanders was attending a family gathering, in the general vicinity of the shooting. She witnessed the argument between Turner and Nelson and testified that Turner had made a telephone call. She further testified that someone in the crowd had said, "She's going to call her brother." Sanders then saw, within minutes of Turner's telephone call, a maroon or burgundy car pull up to the scene and a passenger exit from the car, holding a gun. The passenger walked up to Nelson and began shooting.

{¶ 17} Afterward, Sanders was taken to police headquarters and shown a photographic lineup, but she could not positively identify the shooter. She initially testified under cross-examination that the shooter had been wearing a multicolored shirt, but during redirect, after the assistant prosecuting attorney had played a tape of Sanders's 9-1-1 call for assistance, she changed her testimony and said that the shooter had been wearing a white T-shirt. Sanders was not asked to and did not make a positive identification of Anderson as the shooter during her testimony.

{¶ 18} Erica Jones testified that she was 16 years old, knew Turner personally, but knew Turner's brother only as "PZ." In court, Jones identified Anderson as PZ. Jones testified that Turner and Nelson had gotten into an argument, that Nelson had called Turner a bitch, and that Turner had subsequently made a telephone call. Jones then testified, "After she [Turner] called him, he came, he shot, and then he ran off." But Jones never specifically identified "he" or "him." Although she was able to place PZ at the murder scene and did hear gunshots, Jones further testified that she never saw a gun and did not definitively testify that PZ, i.e., Anderson, had shot Nelson.

{¶ 19} To reiterate, the only person who explicitly identified Anderson as the shooter was Epps. This testimony was elicited on recall after he had discussed his testimony with the investigating detective in violation of the trial court's orders. The only relevant addition to Epps's testimony on recall was his positive

identification of Anderson as the shooter.  We hold that the trial court abused its discretion in allowing Epps to be recalled to the witness stand, and we sustain Anderson's second assignment of error.

### V.  Sufficiency of the Evidence and Conclusion

{¶ 20} In his third assignment of error, Anderson argues that his convictions were based upon insufficient evidence and were contrary to the manifest weight of the evidence.  "The test [for the sufficiency of the evidence] is whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt."[9]

{¶ 21} Reviewing the record under this standard, we hold that Anderson's convictions were supported by sufficient evidence.  And our resolution of Anderson's second assignment of error renders moot that part of his third assignment of error in which he argues that his convictions were against the manifest weight of the evidence.  Therefore, we do not address that argument. Having sustained Anderson's second assignment of error, we reverse the judgment of the trial court and remand this cause for a new trial.

<div style="text-align:right">

Judgment reversed
and cause remanded.

</div>

CUNNINGHAM, P.J., and SUNDERMANN, J., concur.

</div>

---

9.  State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.