[Cite as *State v. Bell*, 2015-Ohio-4178.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No.   102141

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## KEVIN BELL

DEFENDANT-APPELLANT

**JUDGMENT:**
CONVICTIONS AFFIRMED; SENTENCE
VACATED; REMANDED FOR RESENTENCING

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-577001-A

**BEFORE:** Boyle, J., Jones, P.J., and McCormack, J.

**RELEASED AND JOURNALIZED:**   October 8, 2015

**ATTORNEYS FOR APPELLANT**

Robert L.   Tobik
Cuyahoga County Public Defender
BY: Erika B.   Cunliffe
Assistant Public Defender
310 Lakeside Avenue
Suite 200
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY: Mary Weston
Assistant County Prosecutor
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, J.:

{¶1} Defendant-appellant, Kevin Bell, appeals his conviction and sentence. He raises five assignments of error for our review:

> 1. The prosecution, initiated nearly 20 years after the alleged misconduct, violated Kevin Bell's constitutional rights to due process and a fair trial as protected by the Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.
>
> 2. Mr. Bell's rights to due process and a fair trial were violated because of the prosecutor's improper remarks during closing arguments.
>
> 3. Trial counsel was ineffective for failing to interpose contemporaneous objections to the prosecutor's improper closing arguments.
>
> 4. The trial court committed plain error and imposed a sentence not authorized by law when it sentenced Mr. Bell to an indefinite term of 7 - 25 years in prison under pre-S.B. 2 sentencing law.
>
> 5. The trial court committed error when it imposed a period of post-release control on Mr. Bell although the offense of which he was convicted occurred more than three years before the effective date of Am.Sub.S.B. 2.

{¶2} Finding merit to his fourth assignment of error, we vacate Bell's sentence and remand for resentencing.

### Procedural History and Factual Background

{¶3} In August 2013, Bell was indicted on one count of rape in violation of R.C. 2907.02(A)(2) and one count of kidnapping in violation of R.C. 2905.01(A)(4). Both counts carried notice of prior conviction and repeat violent offender specifications. The indictment alleged that the date of the offense was

August 11, 1993. Bell was charged after his DNA was found by the Ohio Attorney General's Bureau of Criminal Investigation and Identification ("BCI") when it tested the rape kit that had been collected from the victim on the night of the incident. The trial court dismissed the specifications prior to trial. The remaining facts were presented at a jury trial.

{¶4} L.B., the victim, testified that during the summer of 1993, she came from Ann Arbor, Michigan, where she lived, to Cleveland, Ohio, to spend the summer with her aunt. L.B. had just graduated from high school that spring. L.B.'s best friend, M.H., came with her to Cleveland for the summer. L.B.'s aunt lived on Cleveland's eastside, in the area of East 114th Street and Superior Avenue, which she remembered was called "Hell's Kitchen."

{¶5} L.B. stated that she and M.H. used to walk around and meet people, and just "have fun." L.B. had a boyfriend that summer; his name was Anthony Lawrence.

{¶6} On the night of the incident, L.B. testified that she and M.H. were walking down the street when they saw a black male, whom they had met a couple of nights before that night. She knew his name back then, but she could not recall it at the time of trial. L.B. said that she and M.H. went to his house. When they were ready to leave, the male told them that it was not safe outside so he would walk them home. L.B. did not recall if the male was alone or if anyone else came with him. As they were walking past "some bushes," the male pulled her into the bushes, pulled down her "panties" and shorts, and told her to "shut the fuck up." He then raped her vaginally.

**{¶7}** L.B. said that after the incident, she "went straight to a pay phone and called police." She told police that she had just been raped. They transported her to the hospital. At the hospital, a rape kit was collected from her.

**{¶8}** L.B. said that she did not recall the name "Kevin Bell." She testified that she never had consensual sex with someone named Kevin Bell, nor with someone named "Delon" or "Deleon."

**{¶9}** L.B. looked at several photo arrays. She said that one of the men in one of the photo arrays looked familiar to her from her time in Cleveland, but she did not recognize any of the men as someone who raped her or as someone with whom she had consensual sex during the summer of 1993.

**{¶10}** L.B. said that she had reviewed her medical records. She recalled telling the nurses and doctors what had happened to her. She said that she would have been telling the truth when she talked to them, and she agreed that her memory of the incident would have been better at that point than it was at trial. She told doctors at that time that she had not had consensual sex for two weeks prior to the incident; it was with her boyfriend. L.B. stated that she only had consensual sex with her boyfriend that summer.

**{¶11}** L.B. testified that when she was contacted by investigators 20 years later, she did not recall being raped. She stated, "I literally didn't remember being in Cleveland." She said that after the incident, she left Cleveland and must have blocked the whole thing out of her mind.

**{¶12}** L.B. testified that she had no recollection of telling police or doctors that two people raped her, but she would have been telling the truth back then.

**{¶13}** On cross-examination, defense counsel asked L.B. if she recalled telling police that the two men who raped her were named Mark and "Dolon or Deleon." L.B. did not recall any names. But she said that she had no reason to lie, so the police report was probably accurate. She also did not recall telling police that the first person who raped her, "Dolon or Deleon," was "six feet tall, 170 pounds, well built, approximately 23 years old with light skin." Nor did L.B. recall telling police that the second person who raped her, Mark, was "5-9, 120 [pounds], 30 years old, [and had] dark skin."

**{¶14}** M.H. testified that on the night of the incident, she and L.B. went to visit L.B.'s boyfriend, Anthony. M.H. said that when they left Anthony's home it was dark. As they were walking back to L.B.'s aunt's house, L.B. "got raped." M.H. said that two black males approached them from behind. M.H. recognized one of them as someone she had seen previously; she said that they had been to his house before the night of the incident. She recalled that he lived with his grandfather.

**{¶15}** M.H. remembered L.B. getting raped in an alley. She said that the male was behind L.B. and had pulled her pants down. M.H. saw it happen. She said that L.B. was "frightened, scared, [and] telling them to stop." M.H. was standing very close to the male and L.B. as the man was raping L.B.

**{¶16}** M.H. said that the male who was raping L.B. had a broken beer bottle in his hand and threatened M.H. with the bottle when she tried to get him off of L.B. M.H.

could not remember what the other male was doing.   The men left after the rape.   M.H. and L.B. immediately called 911 on a pay phone.

{¶17} M.H. was not able to identify Bell in a photo array as the person who raped L.B. in August 1993.

{¶18} Dr. Brian Huettl testified that he examined L.B. on the night of the incident. Dr. Huettl said that his notes from that night indicate:

> Patient is a 18-year-old black female who reportedly was assaulted early this morning by two black males.   Patient states that she and a friend were walking down the street — parenthetically, 105th Street — when she saw D — first initial — with a friend.   They were beating people up with a broken bottle.   D stayed with the patient.   His friend took the patient's friend down the street.   D threatened the patient saying that if she left, he would beat her up.   He told her to stay still, grabbing her from behind, pulling her * * * [p]ants and panties down and forcibly penetrating her vaginally.   Patient does not know if he ejaculated.   D's friend returned to the scene and was told now it's your turn.   He followed D's instructions and also penetrated her — the patient vaginally.

{¶19} Dr. Huettl testified that patient was "composed, but obviously upset."   L.B. further told Dr. Huettl that her most recent consensual sex encounter had been two weeks previously and that two people had attacked her that night.   Dr. Huettl testified that the patient was in a state of "shock and disbelief, but was able to talk about it."

{¶20} The rape kit was originally received by the Cleveland Police Department lab on August 16, 1993.   Several Cleveland police officers testified as to the chain of custody of the rape kit.   The kit was sent to BCI on May 18, 2012.   Two unique DNA profiles were found from swabs taken from L.B.'s vagina (including blood and semen) when the rape kit was collected — one belonging to L.B. and one belonging to Bell.

Further, a "cutting" from L.B.'s shorts and a "differential cutting from the underwear resulted in a mixture consistent with contributions from [the victim], Kevin Bell, and an unknown individual." BCI examiners later tested Deleon Nimons's DNA against the unknown DNA, and found that he could not be excluded as a contributor to the mixture of DNA found on L.B.'s underwear. But no conclusions could be made regarding the shorts because there was "insufficient data."

{¶21} Brenda McNeely, an agent for BCI, testified that she was assigned to work on Bell's case. She reviewed the Cleveland police report that was completed in 1993 at the time of the incident. She located the victim in Michigan. She ruled out Bell as one of L.B.'s consensual sexual partners. McNeely then sent another agent to Michigan to show L.B. a photo array with Kevin Bell in it. McNeely said that L.B. did not recognize Bell in the photo array.

{¶22} McNeely said that she traveled to Michigan to meet with M.H. Special agent John Saraya went with her. Agent Saraya showed M.H. a photo array; she did not recognize Bell in the photo array either.

{¶23} From the police report in 1993, McNeely learned that a possible rape suspect, Deleon Nimons, lived at 10220 Empire, with his grandfather. She located him in Cleveland, Ohio. She showed him photos of L.B., M.H., and Bell, and he recognized all of them. McNeely only talked to Nimons for about 45 minutes that day. After that, he began calling her every day, several times a day. When McNeely asked him if they would find his DNA on the victim, Nimons was very agitated and scared. McNeely said

that she was under the impression that there were two men who raped the victim, so she was trying to determine if Nimons was one of the perpetrators. McNeely learned that the rape may have occurred in the area of "105th and Kempton," near where Nimons lived with his grandfather. Nimons would not consent to giving a bucal swab for DNA testing, so McNeely obtained a search warrant to do so.

{¶24} Nimons testified that in 1993 he lived with his grandfather on Empire Avenue in Cleveland, Ohio. Nimons was "best friends" with Mark Henderson. He also knew Kevin Bell from the neighborhood, but was not close friends with him. Nimons recalled that he was on house arrest that summer. He remembered cutting his ankle bracelet off on the night of August 11, 1993. Nimons saw Bell in an alley walk off with a girl. As he was walking away, he heard the girl say, "Stop. Kevin, stop."

{¶25} Nimons testified that a week before seeing Bell in the alley with the girl, he had consensual sex with that same girl at his house. Nimons admitted that he only told police this fact after his DNA could not be excluded from a cutting of L.B.'s underwear.

{¶26} On cross-examination, Nimons agreed that his attorney told him that he could never be charged with raping L.B. because the statute of limitations had run.

{¶27} Mark Henderson testified that he was currently in prison for aggravated murder. He said that he was 23 years old in the summer of 1993. Henderson did not recall much from that summer because he did "a lot of drugs" and drank a lot. Henderson said that he was childhood friends with Bell and Nimons. He did not

remember L.B. or M.H. from that summer.   Henderson stated that he did see Nimons beat up his girlfriend one time.

**{¶28}** The jury found Bell guilty of both counts — kidnapping and rape.   The trial court merged the counts for purposes of sentencing, and the state elected to proceed on the rape count.   The trial court sentenced Bell to seven to 25 years under the pre-S.B. 2 sentencing laws.   The court further classified Bell as a sexually oriented offender under H.B. 180.   The court also imposed postrelease control, but later issued a nunc pro tunc removing postrelease control.   It is from this judgment that Bell appeals.

Preindictment Delay

**{¶29}** In his first assignment of error, Bell argues that the state violated his due process rights when it prosecuted him nearly 20 years after the alleged misconduct.

**{¶30}** The delay between the commission of an offense and an indictment, can, under certain circumstances, constitute a violation of due process of law guaranteed by the federal and state constitutions.   *See State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984); *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

**{¶31}** The statute of limitations governing a particular crime provides the "primary guarantee against bringing overly stale criminal charges."   *State v. Copeland*, 8th Dist. Cuyahoga No. 89455, 2008-Ohio-234, ¶ 10, citing *Lovasco*.   In 1999, the Ohio General Assembly extended the statute of limitations for rape from 6 to 20 years.   *See* R.C. 2901.13(A)(3)(a).   The amendment applies retroactively to offenses committed prior to

the amendment, provided that the statute of limitations for such offenses had not yet expired by March 9, 1999. *Copeland* at ¶ 11. Here, Bell concedes that the statute of limitations to bring rape charges had not yet expired when the General Assembly's amendment of R.C. 2901.13 became effective in March 1999; Bell's indictment was filed two days before the 20-year statute of limitations expired.

{¶32} Courts apply a two-part test to determine whether preindictment delay constitutes a due process violation. The defendant has the initial burden to show that he was substantially and actually prejudiced due to the delay. *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998). But "proof of actual prejudice, alone, will not automatically validate a due process claim" as "the prejudice suffered by the defendant must be viewed in light of the state's reason for the delay." *Luck* at 154, citing *Marion*. Thus, once a defendant establishes "actual prejudice," the burden then shifts to the state to produce evidence of a justifiable reason for the delay. *Id.* Thereafter, the due process inquiry involves a balancing test by the court, weighing the reasons for the delay against the prejudice to the defendant, in light of the length of the delay. *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 51.

{¶33} Prejudice is not presumed solely due to a lengthy delay. *Copeland* at ¶ 13. "The determination of 'actual prejudice' involves 'a delicate judgment based on the circumstances of each case.'" *Walls* at ¶ 52, quoting *Marion*, 404 U.S. at 325, 92 S.Ct. 455, 30 L.Ed.2d 468.

{¶34} In the past, this court required a defendant to also establish that any missing evidence, lost witnesses, or physical evidence, adversely affected his ability to defend himself. Specifically, this court required a defendant to demonstrate that missing evidence was nonspeculative and exculpatory. *See State v. McFeeture*, 8th Dist. Cuyahoga No. 100434, 2014-Ohio-5271; *Copeland*, 8th Dist. Cuyahoga No. 89455, 2008-Ohio-234. But in a recent en banc decision, *State v. Jones*, 8th Dist. Cuyahoga No. 101258, 2015-Ohio-2853, this court held that under the facts of that case, the defendant suffered actual prejudice due to a nearly 20-year preindictment delay under the general "concepts of due process and fundamental justice," rather than the "the exculpatory evidence standard." *Id.* at ¶ 47.

{¶35} In *Jones*, a majority of this court focused on the fact that in that case, identity was not an issue. The victim was acquainted with the defendant and had gone with him to his mother's house. She identified him by his first and last name from the beginning, telling police and medical personnel. Therefore, we determined that because identity was not an issue in the case, the DNA results did not "advance the case." *Id.* at ¶ 42. We held that to require the defendant to prove that missing evidence would have been exculpatory would have been a "near impossibility" because no evidence was ever collected by the police, i.e., no photos of the victim were ever taken, no photos of the alleged crime scene were taken, and the victim's clothing was not retained. Jones's mother, who was (according to the victim) in the other room when the alleged rape occurred, had since died; she had never been interviewed by police. We explained that

anything she might have said was speculative and, thus, requiring Jones to prove that her testimony would be exculpatory is "simply violative of his due process rights." *Id*. at ¶ 46.

{¶36} In *Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097, the Ohio Supreme Court held that the defendant suffered actual prejudice by the preindictment delay because two key witnesses had died and all of the tape recorded interviews with potential witnesses had been destroyed. *Id.* at 157-158. The Supreme Court held that the state's reason for the delay, "a police error in judgment as to whether [the] case should have been submitted to the prosecutor's office," was not a justifiable delay in light of the prejudice to the defendant. *Id*. at 158. The Supreme Court explained:

> In the instant case, the state delayed prosecuting the defendant because of an alleged "error in judgment," which lead to a halt in the Lakewood Police Department's active investigation of Tietjen's death. This investigation remained at a stand-still for approximately fifteen years. During that time, witnesses died, memories faded, and evidence was lost. When the state finally decided to commence its prosecution of the defendant herein, it did so without one shred of new evidence — its case being substantially the same as it had been since 1968. For these reasons, we find that the pre-indictment delay in the instant case is unjustifiable.

*Id*. at 158-159.

{¶37} In *Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, the defendant was indicted 13 years after the victim was murdered soon after police submitted fingerprints found at the victim's home to "an on-line automated fingerprint identifications system," which had just become available and subsequently identified him

as a good match. *Id.* at 438. Walls argued that the delay prejudiced him in several ways. The Supreme Court explained:

> Walls insists that the passage of time resulted in the loss of substantial exculpatory evidence. He argues that the coroner's investigator— if he had been alive to testify— could have placed the time of death during school hours rather than at 4:00 p.m. Walls also contends that missing school attendance records would have shown that he was in school on the afternoon of the murder. He further believes that unavailable witnesses could have supplied evidence implicating one Anthony Gray as the murderer. In particular, he claims that an acquaintance of Gray's, Dawn Smith, had heard Gray tell his cousin that he had killed a woman on the street where the murder took place. Walls argues that he was prejudiced even further by the death of the lead investigator because only the investigator knew why Gray was considered a suspect. Finally, Walls contends that he was prejudiced by the disappearance of specific items of evidence: (1) a tape made by a neighbor describing a person she saw entering the victim's house, (2) a faucet handle from the victim's home that had a blood stain on it, and (3) an anonymous letter that apparently discussed who committed the murder.

*Id.* at ¶ 53.

{¶38} The state countered in *Walls* that although the coroner's assistant was deceased, the Butler County coroner testified at length as to the time of death. The state further countered that despite missing attendance records from individual classes, the state produced evidence that Walls was in school on the day of the murder. And "[a]s to the evidence concerning the other suspect, police located [her] but considered her unreliable[.]" *Id.* at 453. Finally, the state argued that the "scientific testing revealed that a bloodstain on a 'missing' pillow taken from the Gray's home did not contain the victim's DNA." *Id.*

{¶39} In rejecting Walls's claims, the Supreme Court explained:

In addition to the state's substantial arguments refuting Walls's contentions, we must also consider the fingerprint evidence implicating Walls. Though Walls stated that he had never been to the victim's home, his fingerprints were found in incriminating locations around the house, including on the storm door and on items scattered about the ransacked home. Furthermore, the fingerprints found in the home did not match those of Gray, the individual who Walls claims actually committed the crime.

Although some prejudice may have occurred from evidence lost over the years, we conclude that Walls's claims of prejudice are speculative at best. *Marion*, 404 U.S. at 326, 92 S.Ct. 455, 30 L.Ed.2d 468. Moreover, we are firmly convinced that the delay was justified. As the United States Supreme Court explained, "To prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Lovasco*, 431 U.S. at 796, 97 S.Ct. 2044, 52 L.Ed.2d 752. Here, the indictment occurred only a couple of months after new computer technology made it possible to match the fingerprints at the murder scene to those of Walls. Prior to the advent of that technology, the state had no means of obtaining a match for these prints. Upon receiving the new fingerprint evidence, the state proceeded diligently to initiate proceedings against Walls. This situation is distinctly different from cases in which the state has compiled evidence but simply fails, or refuses, to take action for a substantial period. *See*, *e.g*., *Luck*, 15 Ohio St.3d 150, 15 OBR 296, 472 N.E.2d 1097. Because the delay here was justified, the 13-year hiatus between the offense and the indictment did not violate Walls's due process rights.

*Id.* at ¶ 55-56.

{¶40} Here, Bell argued in his motion that he was "seriously prejudiced" by the 20-year delay by loss of evidence and witnesses, and the fading memories of the defendant and the victim. The loss of evidence that Bell was specifically referring to in his motion were the medical records from the night the victim went to the hospital. But the state later obtained the medical records, and even had the treating physician testify to such records. Bell also argues on appeal that L.B.'s aunt "may have provided important

evidence about L.B.'s conduct that summer," and the 911 call may have been helpful to his case because L.B. "likely gave the dispatcher a description of her attacker."

**{¶41}** Bell further argued in his motion that because he cannot remember that night, he cannot defend himself. He asserts that if the state had brought charges against him in a reasonably timely fashion, he may have been able to establish a "clear alibi for the offense." He argues that he could have had a consensual sexual encounter with the victim "at some point in and around that night." He also argues that the victim's and M.H.'s faded memory also prejudice his ability to establish his defense. He claims that the "passage of time" interfered with his right to confront and cross-examine the evidence presented by "the girls" because they do not recall what happened.

**{¶42}** The state asserts that many courts, including the United States Supreme Court in *Marion*, 404 U.S. at 326, 92 S.Ct. 455, 30 L.Ed.2d 468, have held that faded memory is insufficient to establish actual prejudice. In *Marion*, the high court explained:

> Appellees rely solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment. Events of the trial may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature.

**{¶43}** While we agree with the state that faded memory alone may not amount to actual prejudice, "[t]he determination of 'actual prejudice' involves 'a delicate judgment

based on the circumstances of each case.'"  *Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, at ¶ 52, quoting *Marion* at 325.

{¶44} After review, we conclude that as in *Walls*, there is no doubt that some prejudice to Bell may have occurred from the 20-year delay.   But when balancing the prejudicial delay in this case against the state's justifiable reason for the delay, we conclude that Bell's due process rights were not violated.

{¶45} Indeed, in this case, there was quite a bit of evidence that was not lost.   The victim's underwear and shorts from the night of the incident were collected and kept by police in the evidence room.   Although the original police officers who investigated the case were not available to testify, many witnesses were, including the victim, M.H. (who was an eyewitness to the rape), the physician who treated L.B. at the hospital on the night of the rape, and two other witnesses, Mark Henderson and Deleon, who were originally named by L.B. and M.H. as possible suspects in the rape.   Bell was able to fully challenge and cross-examine all of these witnesses.

{¶46} Notably, even though L.B. and M.H. originally said that two men raped L.B. on that night in August 1993, and then they testified at trial that they could not remember the second man raping L.B., they could remember a lot of details about what had occurred that night.   Their versions of the events differed slightly from each other and from their original account, but the jury was able to fully determine their credibility.

{¶47} Just as the Ohio Supreme Court could not ignore the fact that the defendant's fingerprints were found at the victim's home in *Walls*, 96 Ohio St.3d 437,

2002-Ohio-5059, 775 N.E.2d 829, we cannot ignore the fact that Bell's DNA was found on a swab taken from L.B.'s vagina within hours of the rape. This was new evidence, justifying the delayed indictment. Although Bell argues that his DNA could have been present from consensual sex, the victim and M.H. both testified that L.B. went to the hospital immediately after she was raped, both reporting at that time that two men raped L.B. on that night. Further, L.B. told doctors on the night of the rape in August 1993 that it had been two weeks since she had consensual sex with her boyfriend.

**{¶48}** Accordingly, we overrule Bell's first assignment of error.

Prosecutorial Misconduct

**{¶49}** In his second assignment of error, Bell argues that his right to a fair trial was violated because of improper remarks made by the prosecutor in closing arguments. Specifically, he points to the following passage:

> [T]hroughout [defense counsel's] closing argument I couldn't help but be reminded of an octopus. An octopus doesn't have most obvious ways to defend itself, it doesn't have claws, it doesn't have teeth. When an octopus is attacked, it emits this ink sac that clouds up the water. An octopus can just retreat into the murkiness.
>
> It will be up for you to decide if you have heard any rational arguments from this defendant that gets this defendant out of under this overwhelming evidence of his guilt. I am here, and I want to spend a little time clearing up that murkiness, all right? Let's get rid of the ink. *Let's talk about what the evidence is in this case, because you've taken an oath to return a verdict that's based on evidence, right?*
>
> *You've been instructed that what the attorneys say is not evidence. You're going to have to go back into the deliberation room and return a verdict that is based on what you heard and what you saw, and nothing else.*

I want to comment on a few things that defense counsel made in her argument because I don't want there to be confusion. I don't want this ink out there confusing you.

(Emphasis is language in the prosecutor's comments that Bell did not include in his argument on appeal.)

{¶50} Bell did not object to the prosecutor's comments. Thus, he has waived all but plain error. The plain error standard, however, is essentially the same as the review for prosecutorial misconduct standard — did the prosecutor's comments prejudice Bell's substantial rights? In other words, the alleged prosecutorial misconduct constitutes plain error only if it is clear that Bell would not have been convicted in the absence of the improper comments. *See State v. Slagle*, 65 Ohio St.3d 597, 606, 605 N.E.2d 916 (1992).

{¶51} Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived the appellant of a fair trial based on the entire record. *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶52} With respect to closing argument, the prosecutor is entitled to a certain degree of latitude. *State v. Apanovitch*, 33 Ohio St.3d 19, 514 N.E.2d 394 (1987). Isolated comments, therefore, should not be taken out of context and given their most damaging meaning. *State v. Carter*, 89 Ohio St.3d 593, 734 N.E.2d 345 (2000).

Nonetheless, the prosecutor must confine himself to certain limits. *See State v. Liberatore*, 69 Ohio St.2d 583, 433 N.E.2d 561 (1982).

{¶53} Bell argues that the prosecutor's comments violated his right to remain silent, his right to the presumption of innocence, and were sufficiently flagrant such that reversal is warranted "despite counsel's failure to object to them."

{¶54} In *State v. Smith*, 130 Ohio App.3d 360, 720 N.E.2d 149 (1st Dist.1998), the prosecutor stated that defense counsel was "really good at making * * * chicken salad out of chicken [shit]." The court found that the comments improperly denigrated defense counsel. The court in *Smith* explained:

> A prosecutor may argue and argue ardently that the evidence does not support the conclusion postulated by defense counsel. A prosecutor may not, however, denigrate the role of defense counsel by injecting his personal frustration with defense tactics[.] * * * The prosecutor was not entitled to employ * * * argument to denigrate the role of defense counsel and to insinuate to the jury that [the defendant] and his counsel, by exercising their right to suggest what conclusions may or may not have been drawn from the evidence found at trial, were seeking to hide the truth.

*Id.* at 368-369, quoting *State v. Hart*, 94 Ohio App.3d 665, 641 N.E.2d 755 (1st Dist.1994).

{¶55} Here, we find that the prosecutor's comments regarding the octopus were similar to those made by the prosecutor in *Smith*, and were somewhat denigrating to defense counsel, which is improper. But we disagree with Bell that these comments violated his right to remain silent or his right to the presumption of innocence. In *Smith*, the court found that when the prosecutor commented on the defendant's lack of an alibi, that it was "adversely directed to Smith's decision not to testify." *Id.* at 367. But here,

while we agree that the prosecutor may have improperly suggested that defense counsel and Bell were seeking to hide the truth, that did not amount to violating his right to remain silent or right to presumption of innocence.

{¶56} Further, in the context of the entire closing argument, we do not find that the prosecutor's isolated remarks about the octopus analogy "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Apanovitch*, 33 Ohio St.3d at 24, 514 N.E.2d 394.

{¶57} Accordingly, Bell's second assignment of error is overruled.

Ineffective Assistance of Counsel

{¶58} In his third assignment of error, Bell argues that his trial counsel was ineffective for failing to object to the prosecutor's comments during closing argument.

{¶59} To prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show deficiency, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance. *Id.* The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings. *Id.* Hindsight may not be allowed to distort the assessment of what

was reasonable in light of counsel's perspective at the time. *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

{¶60} Even assuming that counsel's performance was ineffective, the defendant must still show that the error had an effect on the judgment. *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). Reversal is warranted only where the defendant demonstrates that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.*

{¶61} In this case, even assuming that defense counsel should have objected, the fact that she did not do so did not affect the outcome of trial. As we found in the previous assignment of error, the prosecutor's isolated comments in the context of the entire closing arguments were not such that the jury would have found Bell not guilty without the comments. The same applies to defense counsel not objecting to those comments.

{¶62} Bell's third assignment of error is overruled.

Pre-S.B. 2 Sentence

{¶63} In his fourth assignment of error, Bell argues that the trial court erred when it sentenced him to an indefinite prison term under pre-S.B. 2 sentencing law. He maintains that although the offense was in 1993, he should have been sentenced under Am.Sub.H.B. 86 ("H.B. 86") that went into effect on September 30, 2011.

{¶64} We agree with Bell's arguments as this court has already decided this exact issue. *See State v. Jackson*, 8th Dist. Cuyahoga No. 100877, 2014-Ohio-5137, ¶ 29-39,

*discretionary appeal not allowed*, *State v. Jackson*, 64 Ohio St.3d 1465, 2015-Ohio-1896, 30 N.E.3d 974 (for a full discussion and analysis on this issue). Thus, in accordance with *Jackson*, we vacate Bell's indefinite sentence and remand with instructions for the trial court to sentence Bell under H.B. 86. Bell's fourth assignment of error is sustained.

Postrelease Control

**{¶65}** In his fifth assignment of error, Bell argues that if this court determines that the trial court properly sentenced him to an indefinite sentence, then postrelease control does not apply because it did not exist before S.B. 2. We note that the trial court originally included postrelease control in its sentencing entry, but later issued a nunc pro tunc removing it. But in the last assignment of error, we vacated Bell's sentence and instructed the trial court to resentence Bell under H.B. 86. Because postrelease control applies under H.B. 86, the trial court should address it when resentencing Bell.

**{¶66}** Bell's fifth assignment of error is overruled because it is moot.

**{¶67}** Convictions affirmed. Sentence vacated. Case remanded for resentencing under H.B. 86.

It is ordered that appellee and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for resentencing.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, JUDGE

LARRY A. JONES, SR., P.J., and
TIM McCORMACK, J., CONCUR