[Cite as *State v. Bell*, 2017-Ohio-7168.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105000**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# KEVIN BELL

DEFENDANT-APPELLANT

## JUDGMENT:
**AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED**

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-577001-A

**BEFORE:** Keough, A.J., E.T. Gallagher, J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** August 10, 2017

**ATTORNEYS FOR APPELLANT**

Timothy Young
Ohio Public Defender
By:   Allen Vender
Assistant State Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio 43215


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
By: Daniel T. Van
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, A.J.:

{¶1} Defendant-appellant, Kevin Bell ("Bell"), appeals from the trial court's judgment dismissing his petition for postconviction relief without a hearing. He raises five assignments of error for our review. Finding some merit to the appeal, we reverse and remand for a hearing on Bell's petition.

## I. Background and Procedural History

{¶2} The underlying case against Bell arises from the rape and kidnapping of L.B. on August 11, 1993. Bell was indicted in August 2013 after his DNA was found by Ohio's Bureau of Criminal Investigation and Identification when it tested the rape kit that had been collected from L.B. on the night of the incident.

{¶3} The facts of the case were set out in pertinent part by this court in *State v. Bell*, 8th Dist. Cuyahoga No. 102141, 2015-Ohio-4178, as follows:

> L.B., the victim, testified that during the summer of 1993, she came from Ann Arbor, Michigan, where she lived, to Cleveland, Ohio, to spend the summer with her aunt. * * * L.B.'s best friend, M.H., came with her to Cleveland for the summer. * * *
>
> L.B. stated that she and M.H. used to walk around and meet people, and just "have fun." L.B. had a boyfriend that summer; his name was Anthony Lawrence.
>
> On the night of the incident, L.B. testified that she and M.H. were walking down the street when they saw a black male, whom they had met a couple of nights before that night. She knew his name back then, but she could not recall it at the time of trial. L.B. said that she and M.H. went to his house. When they were ready to leave, the male told them that it was not safe outside, so he would walk them home. L.B. did not recall if the male was alone or if anyone else came with him. As they were walking past

"some bushes," the male pulled her into the bushes, pulled down her "panties" and shorts, and told to "shut the f— up." He then raped her vaginally.

L.B. said that after the incident, she "went straight to a pay phone and called police." She told police that she had just been raped. They transported her to the hospital. At the hospital, a rape kit was collected from her.

L.B. said that she did not recall the name "Kevin Bell." She testified that she never had consensual sex with someone named Kevin Bell, nor with someone named "Delon" or "Deleon."

L.B. looked at several photo arrays. She said that one of the men in one of the photo arrays looked familiar to her from her time in Cleveland, but she did not recognize any of the men as someone who raped her or as someone with whom she had consensual sex during the summer of 1993.

* * * L.B. recalled telling the nurses and doctors what had happened to her. She said that she would have been telling the truth when she talked to them, and she agreed that her memory of the incident would have been better at that point than it was at trial. She told doctors at that time that she had not had consensual sex for two weeks prior to the incident; it was with her boyfriend. L.B. stated that she only had consensual sex with her boyfriend that summer.

L.B. testified that when she was contacted by investigators 20 years later, she did not recall being raped. She stated, "I literally didn't remember being in Cleveland." She said that after the incident, she left Cleveland and must have blocked the whole thing out of her mind.

L.B. testified that she had no recollection of telling police or doctors that two people raped her, but she would have been telling the truth back then.

On cross-examination, defense counsel asked L.B. if she recalled telling police that the two men who raped her were named Mark and "Dolon or Deleon." L.B. did not recall any names. But she said that she had no reason to lie, so the police report was probably accurate. She also did not recall telling police that the first person who raped her, "Dolon or Deleon," was "six feet tall, 170 pounds, well built, approximately 23 years old with light skin." Nor did L.B. recall telling police that the second person who raped her, Mark, was "5-9, 120 [pounds], 30 years old, [and had] dark skin."

M.H. testified that on the night of the incident, she and L.B. went to visit L.B.'s boyfriend, Anthony. M.H. said that when they left Anthony's home it was dark. As they were walking back to L.B.'s aunt's house, L.B. "got raped." M.H. said that two black males approached them from behind. M.H. recognized one of them as someone she had seen previously; she said that they had been to his house before the night of the incident. She recalled that he lived with his grandfather.

* * *

M.H. was not able to identify Bell in a photo array as the person who raped L.B. in August 1993.

Dr. Brian Huettl testified that he examined L.B. on the night of the incident. Dr. Huettl said that his notes from that night indicate:

> Patient is a 18-year-old black female who reportedly was assaulted early this morning by two black males. Patient states that she and a friend were walking down the street — parenthetically, 105th Street — when she saw D — first initial — with a friend. They were beating people up with a broken bottle. D stayed with the patient. His friend took the patient's friend down the street. D threatened the patient saying that if she left, he would beat her up. He told her to stay still, grabbing her from behind, pulling her * * * [pants] and panties down and forcibly penetrating her vaginally. Patient does not know if he ejaculated. D's friend returned to the scene and was told now it's your turn. He followed D's instructions and also penetrated her — the patient — vaginally.

* * * L.B. further told Dr. Huettl that her most recent consensual sex encounter had been two weeks previously and that two people had attacked her that night. * * *
The rape kit was originally received by the Cleveland Police Department lab on August 16, 1993. * * * The kit was sent to BCI on May 18, 2012. Two unique DNA profiles were found from swabs taken from L.B.'s vagina (including blood and semen) when the rape kit was collected — one belonging to L.B. and one belonging to Bell. Further, a "cutting" from L.B.'s shorts and a "differential cutting from the underwear resulted in a mixture consistent with contributions from [the victim], Kevin Bell, and an unknown individual." BCI examiners later tested Deleon Nimons's DNA

against the unknown DNA, and found that he could not be excluded as a contributor to the mixture of DNA found on L.B.'s underwear. But no conclusions could be made regarding the shorts because there was "insufficient data."

Brenda McNeely, an agent for BCI, testified that she was assigned to work on Bell's case. * * *

From the police report in 1993, McNeely learned that a possible rape suspect, Deleon Nimons, lived at 10220 Empire, with his grandfather. She located him in Cleveland, Ohio. She showed him photos of L.B., M.H., and Bell, and he recognized all of them. * * * When McNeely asked him if they would find his DNA on the victim, Nimons was very agitated and scared. McNeely said that she was under the impression that there were two men who raped the victim, so she was trying to determine if Nimons was one of the perpetrators. McNeely learned that the rape may have occurred in the area of "105th and Kempton," near where Nimons lived with his grandfather. Nimons would not consent to giving a bucal swab for DNA testing, so McNeely obtained a search warrant to do so.

Nimons testified that in 1993 he lived with his grandfather on Empire Avenue in Cleveland, Ohio. Nimons was "best friends" with Mark Henderson. He also knew Kevin Bell from the neighborhood, but was not close friends with him. Nimons recalled that he was on house arrest that summer. He remembered cutting his ankle bracelet off on the night of August 11, 1993. Nimons saw Bell in an alley walk off with a girl. As he was walking away, he heard the girl say, "Stop. Kevin, stop."

Nimons testified that a week before seeing Bell in the alley with the girl, he had consensual sex with that same girl at his house. Nimons admitted that he only told police this fact after his DNA could not be excluded from a cutting of L.B.'s underwear.

On cross-examination, Nimons agreed that his attorney told him that he could never be charged with raping L.B. because the statute of limitations had run.

Mark Henderson testified that he was currently in prison for aggravated murder. He said that he was 23 years old in the summer of 1993. Henderson did not recall much from that summer because he did "a lot of drugs" and drank a lot. Henderson said that he was childhood friends with Bell and Nimons. He did not remember L.B. or M.H. from that summer. Henderson stated that he did see Nimons beat up his girlfriend one time.

{¶4} The jury found Bell guilty of rape in violation of R.C. 2907.02(A)(1) and kidnapping in violation of R.C. 2905.01(A)(4), and the trial court sentenced him to seven to 25 years under the pre-S.B. 2 sentencing laws and classified him as a sexually oriented offender.

{¶5} Bell appealed his conviction and sentence to this court. *Bell*, 8th Dist. Cuyahoga No. 102141, 2015-Ohio-4178. In his appeal, Bell contended that (1) the 20-year preindictment delay violated his due process rights; (2) the prosecutor made improper comments in closing argument; (3) counsel was ineffective for not objecting to the prosecutor's improper comments; (4) the trial court erred in sentencing him under pre-S.B. 2 law instead of H.B. 86, effective September 30, 2001; and (5) the trial court improperly imposed postrelease control.

{¶6} This court affirmed Bell's conviction but remanded for resentencing under H.B. 86. *Id.* at ¶ 67. With respect to preindictment delay, this court found that although there was "no doubt" Bell had suffered "some prejudice" from the 20-year delay, upon balancing the prejudicial delay against the state's justifiable reason for the delay, there was no due process violation. *Id*. at ¶ 44. This court further found that the prosecutor's comments, although improper, did not so infect the trial with unfairness as to make Bell's conviction a denial of due process, *Id.* at ¶ 56, and consequently, trial counsel was not ineffective for not objecting to the comments. *Id.* at ¶ 61. This court remanded for resentencing under H.B. 86, however, and ordered the trial court to address postrelease

control under the statute. *Id.* at ¶65. The Ohio Supreme Court subsequently affirmed Bell's conviction. *State v. Bell*, Slip Opinion No. 2016-Ohio-7560.

{¶7} While his appeal was pending in the Ohio Supreme Court, Bell filed a petition for postconviction relief that set forth four grounds for relief: (1) violation of due process due to preindictment delay; (2) ineffective assistance of counsel because counsel failed to adequately present evidence establishing the preindictment delay; (3) ineffective assistance of counsel because counsel failed to introduce evidence, including the 1993 police report, to support her theory that two men other than Bell had raped L.B., and that Bell had consensual sex with L.B.; and (4) ineffective assistance of counsel because counsel unreasonably advised Bell not to testify. He subsequently filed two amended petitions, as well as supplemental briefing allowed by the court.

{¶8} Attached to Bell's petition were numerous documents, including (1) the 1993 police report, (2) L.B.'s medical records from her examination after the rape; (3) an affidavit from Bell in which he averred that he had consensual sex with L.B. on August 10, 1993; (4) an affidavit from trial counsel in which she averred that Nimons admitted to her that he went to prison the day after the rape, that he continually expressed concerns about being charged with L.B.'s rape, and that his story changed many times (initially he did not know L.B. or M.H., then he may or may not have witnessed a rape, then he had consensual sex with L.B., then he had consensual sex with both L.B. and M.H.); (5) an affidavit from Anthony Lawrence ("Lawrence"), in which he averred that he was L.B.'s boyfriend during the summer of 1993, and that she told him he was not her only consensual sexual partner that summer; (6) a second affidavit from trial counsel in which

she averred that although she interviewed L.B. and M.H. prior to trial, she did not ask them whether L.B. had a consensual sexual relationship with anyone during the summer of 1993, and she did not know about Lawrence until trial; and (7) transcripts of interviews BCI agents conducted with the state's witnesses prior to trial.

{¶9} The trial court denied the petition without a hearing. The court denied the first and second grounds for relief in light of this court's decision on Bell's appeal that found no preindictment delay. Regarding the third claim for relief, the trial court found no ineffective assistance of counsel, ruling that the introduction of evidence is a matter of trial strategy. It further found that because the jury heard evidence that Bell was not named in either the 1993 police report or the medical records, but Deleon and Mark were, evidence from the report was in the record and, therefore, the claim was barred by res judicata. Finally, with respect to the fourth claim for relief, the trial court found no ineffective assistance of counsel because counsel had advised Bell of the pros and cons of testifying, and counsel's advice fell within the realm of tactical decision making. This appeal followed.

## II. Law and Analysis

### A. Petition for Postconviction Relief

{¶10} A petition for postconviction relief is a collateral civil attack on a criminal judgment, not an appeal of the judgment. *State v. Abdussator*, 8th Dist. Cuyahoga No. 92439, 2009-Ohio-5232, ¶ 6. Issues properly raised in a petition for postconviction relief are those that could not have been raised on direct appeal because the evidence supporting

such issues is outside the record. *State v. Milanovich*, 42 Ohio St.2d 46, 50, 325 N.E.2d 540 (1975).

**{¶11}** Under R.C. 2953.21, a criminal defendant seeking to challenge his conviction through a petition for postconviction relief is not automatically entitled to a hearing. Before granting an evidentiary hearing on the petition, the trial court must determine whether there are substantive grounds for relief, i.e., whether there are grounds to believe that there was such a denial or infringement of the rights of the petitioner as to render the judgment void or voidable under the Ohio or United States Constitution. *State v. Betts*, 8th Dist. Cuyahoga No. 92780, 2010-Ohio-438, ¶ 26, citing *State v. Calhoun*, 96 Ohio St.3d 149, 151, 666 N.E.2d 1134 (1996). In determining whether there are substantive grounds for relief, the court must consider the petition, the supporting affidavits, and the documentary evidence, as well as all the files and records pertaining to the proceedings. R.C. 2953.21(C).

**{¶12}** A trial court's decision to deny a postconviction petition without a hearing is reviewed for an abuse of discretion. *Abdussator* at ¶ 15. The trial court does not abuse its discretion in dismissing a petition without a hearing if (1) the petitioner fails to set out sufficient operative facts to establish substantive grounds for relief, or (2) the operation of res judicata prohibits the claims advanced in the petition. *Id.* To overcome the res judicata bar, the evidence must show that the petitioner could not have appealed the constitutional claim based on the information in the original trial record. *State v. Slagter*, 8th Dist. Cuyahoga No. 78658, 2001 Ohio App. LEXIS 4656, *25 (Oct. 18, 2001).

**{¶13}** For clarity, we consider Bell's assignments of error out of order.

**B.    Preindictment Delay**

{¶14} In his second assignment of error, Bell contends that the trial court erred in denying the first ground for relief in his petition, which asserted that the 20-year preindictment delay was a denial of due process.

{¶15} As set forth in *Bell*, *supra*, courts apply a two-part test to determine whether preindictment delay constitutes a due process violation. *Bell*, 8th Dist. Cuyahoga No. 102141, 2015-Ohio-4178 at ¶ 32. The defendant has the initial burden of demonstrating that he suffered actual prejudice as a result of the delay. *Id.* Once a defendant establishes actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay. *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 13. "Thereafter, the due process inquiry involves a balancing test by the court, weighing the reasons for the delay against the prejudice to the defendant in light of the length of the delay." *Bell* at ¶ 32, citing *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 51.

{¶16} Bell contends that the trial court erred in relying on this court's decision on direct appeal to deny his claim that he was denied due process on the basis of preindictment delay. He asserts that this court concluded that he had not established actual prejudice because much of the evidence was not lost; many witnesses, including the victim, were available to testify at trial; and there was DNA evidence. He argues, however, that the new evidence submitted with his petition — the affidavit from Lawrence, L.B.'s boyfriend during the summer of 1993, in which Lawrence averred that L.B. told him she had consensual sex with another male that summer — established

actual prejudice because it undermined L.B.'s testimony at trial that she had consensual sex only with Lawrence, and thereby undermined the value of the DNA evidence from the rape kit for purposes of determining the rapist's identity.

{¶17} Further, Bell contends that there was no justifiable reason for the indictment delay. He argues that L.B. and M.H. identified the suspected rapists on August 11, 1993, immediately after the crime occurred. Noting that the detectives who investigated the case 20 years later were easily able to identify and locate Nimons and Henderson, he contends that there was no justifiable reason for the delay in indicting him.

{¶18} Bell misunderstands the basis for this court's decision that the preindictment delay was not a due process violation. Although the court did not use the term "actual prejudice," it found that Bell may have indeed suffered "some prejudice" as a result of the 20-year delay. *Id.* at ¶ 44. Nevertheless, it concluded that the DNA evidence discovered when BCI tested the rape kit collected from L.B. was "new evidence" that justified the delayed indictment. *Id.* at ¶ 47.

{¶19} We find nothing in Bell's petition or supporting evidence that would change this conclusion: the DNA evidence was admittedly not discovered until 2012 when it was tested. Furthermore, any argument regarding unjustifiable delay based on the detectives' ability to easily locate Nimons and Henderson 20 years after the crime is barred by res judicata because Bell could have made that argument on direct appeal. Accordingly, the trial court did not err in denying the first ground for relief in Bell's petition without a hearing. The second assignment of error is overruled.

**C. Ineffective Assistance of Counsel Regarding Preindictment Delay**

{¶20} In his third assignment of error, Bell contends that the trial court erred in denying the second ground for relief in his petition, which asserted that Bell was denied his constitutional right to effective assistance of counsel because counsel failed to make adequate arguments in the trial court regarding preindictment delay.

{¶21} Specifically, Bell contended that although counsel filed a motion to dismiss due to preindictment delay, she did not provide any evidence to support the motion, including the 1993 police report. Bell contended that the police report would have demonstrated actual prejudice because it reflects what L.B. and M.H. would have testified to at trial had their memories not been impaired: that they gave the police the names and nicknames of the suspected rapists (which did not include his name) and an address at which Suspect 1 lived.

{¶22} Bell also contended in the second ground for relief that counsel was ineffective because she did not renew the motion to dismiss after the state's witnesses — who made clear their memories were severely impaired by the delay — testified at trial.

{¶23} To establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that he was prejudiced by that performance. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694. In

evaluating a claim of ineffective assistance of counsel, a court must be mindful that there are countless ways for an attorney to provide effective assistance in a given case, and it must give great deference to counsel's performance. *Id.* at 689. Trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Gooden*, 8th Dist.Cuyahoga No. 88174, 2007-Ohio-2371, ¶ 38, citing *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).

**{¶24}** Any argument regarding counsel's failure to renew the motion to dismiss after the state's witnesses testified is barred by res judicata because the evidence supporting that argument is contained within the record and could have been brought on direct appeal. With respect to counsel's failure to attach the 1993 police report to the motion to dismiss, we find no ineffective assistance of counsel because, as noted above, this court determined even without the police report that Bell suffered "some prejudice" as a result of the preindictment delay but that the discovery in 2012 of DNA from the rape kit was new evidence that justified the delayed indictment. Thus, we cannot conclude that attaching the police report to the motion to dismiss would have changed the result of the proceeding. The third assignment of error is therefore overruled.

**D.** **Ineffective Assistance of Counsel Regarding Failure to Investigate and Introduce Evidence to Support Trial Strategy**

**{¶25}** In his fourth assignment of error, Bell contends that the trial court erred in denying the third ground for relief in his petition, which asserted that he was denied his constitutional right to effective assistance of counsel because counsel failed to introduce evidence supporting her trial strategy.

{¶26} Defense counsel's strategy at trial was that Nimons and Henderson committed the crime, and Bell had consensual sex with L.B. shortly before the rapes. In the third ground for relief in his petition, Bell asserted that counsel was ineffective because although this was her theory, she failed to introduce evidence either in her possession or available by investigation that (1) L.B. and M.H. originally identified Nimons and Henderson as the suspected rapists; (2) supported L.B. and M.H.'s identification of Nimons and Henderson; and (3) demonstrated Nimons had committed similar prior bad acts. Specifically, Bell contended that counsel was ineffective for not introducing any portion of the 1993 police report, which stated that L.B. and M.H. identified one suspect as "Dolon," nickname "Deli," and the other suspect as "Mark," and gave their physical descriptions. In addition, the report stated that before Suspect 1 raped L.B., he told her, "I'm getting locked up tomorrow and I need some bad." The report further stated that M.H. told the police that Suspect 1 lived at 10220 Empire.

{¶27} In an affidavit attached to Bell's petition, defense counsel averred that she believed the rules of evidence prohibited her from introducing into evidence any portion of the police report. In his petition, Bell argued that counsel's belief was incorrect, however, because the report was admissible under various rules of evidence, and that her incorrect belief was deficient in light of her theory of defense. Bell argued further that it was insufficient for counsel to merely ask L.B. at trial whether she had told the police that the rapists were named Dolon and Mark, and that the police report should have been introduced to show that L.B. and M.H. identified them, not him, as the rapists, and that M.H. told the police that she thought Suspect 1 lived on Empire Avenue. Bell argued

that if the report had come in, the jury could then have considered for identity purposes Nimons's trial testimony that he lived on Empire Avenue in 1993 with his grandfather.

{¶28} Bell's argument fails, however, because the jury heard testimony from L.B. that the police report, wherein she reported that the suspects' names were Dolon or Deleon and Mark, was "probably accurate." In addition, the jury heard Dr. Huettl's testimony that the medical records reflected that L.B. reported being assaulted by two males, one with the first initial of D. Thus, the jury was aware that Bell was not named by L.B. or M.H. as a suspect and, consequently, there is not a reasonable probability that the outcome of the trial would have been different if the police report had been admitted.

{¶29} Bell also argued, however, that counsel was deficient for not adequately investigating and preparing her defense, which was that Bell had consensual sex with L.B. shortly before she was raped. As Bell noted, the state's evidence at trial was that L.B. only had consensual sex with her boyfriend Lawrence during the summer of 1993. The implication was that the presence of anyone else's DNA in the rape kit swabs was the result of the rape charged in the indictment. The determination of whether the DNA was from the perpetrator of the rape or from a consensual encounter was thus the critical question for the jury to determine, especially because L.B. and M.H. had little recollection of the events of August 11, 1993, and could not identify the attacker in 2013 at trial.

{¶30} But counsel did not investigate her theory that Bell was a consensual sex partner of L.B. beyond her interview with Bell. Lawrence's statement undermines the state's trial evidence that Lawrence was L.B.'s only consensual partner that summer and seriously undermines L.B.'s credibility. Counsel did not know about or interview

Lawrence prior to trial, however, because as she acknowledged in her affidavit, she never asked L.B. nor M.H. who they spent time with that summer, or whether L.B. had a boyfriend, was dating anyone, or was having a consensual sexual relationship with anyone. Although counsel's theory was that Bell had consensual sex with L.B., counsel did not broach this topic with either L.B. or M.H. when she interviewed them prior to trial. She asked questions solely about details of the rape during her pretrial interviews of L.B. and M.H. and, as a result, was not aware that L.B. was going to testify that she did not have consensual sex with anyone other than Lawrence. Counsel should have known about Lawrence: L.B.'s medical records state that she had a boyfriend that summer and was having sex with him. But because counsel failed to investigate, she did not know about Lawrence until L.B. testified that he was her boyfriend and only sexual partner that summer, and thus was not prepared to refute L.B.'s testimony. Counsel acknowledged that had she known prior to trial about Lawrence and his statement that L.B. told him she also had consensual sex with another male that summer, "a strong probability exists that this would have changed the outcome of the case based on how she responded to the information on the stand."

{¶31} Counsel also failed to adequately investigate her own client's story. In his affidavit, Bell averred that when counsel told him that the women making the allegations were not from Ohio, he remembered meeting a girl from Michigan that summer. He told counsel that on the night of August 10, 1993,

> [a]s I was driving along down 105th and looking for friends, a girl — who was walking on the sidewalk in the opposite direction — waved at me. I slowed down even more and turned my head to check the girl out. I could

tell she saw that I was checking her out, so I pulled into the parking lot at B&M BBQ. When she saw me pull into B&M, she turned around and walked back toward me. I had pulled into B&M and sat on the hood of my car. The girl had introduced herself as Telisia. Telisia and I talked for a bit. My car had new rims, and the girl noticed. Telisia, after seeing the rims said, "I'm riding with you." Telisia got into my car and we drove over to Gordon Park. Gordon Park is where people went to make out and hook up. I had never had sex outdoors before — or since. The police were in the park and started shining flashlights into all the cars. Telisia had gotten nervous about the police — but she did not call them "police" or "cops." She called the police "one-time's." I remember laughing because we don't say that in Cleveland. * * *

After Telisia and I had consensual sex in the park, I drove her back to B&M BBQ. During this drive, I told her that my child's mother was paging me to get home. This upset Telisia. So when I dropped Telisia off at B&M's, she asked me for some money. I asked her how much, and she said $100. I offered to give her $20-30 and she got angry again. I told her that was no way to ask for money, and she slammed the car door. She never took any money from me.

{¶32} Despite this version of events from her client, counsel did not ask L.B. or M.H., either before or at trial, about these events, or about the name "one-time's" for the police, a detail that, if L.B. admitted she knew, would have significantly supported the defense theory that Bell's sexual encounter with L.B. was consensual.

{¶33} Counsel also failed to question M.H. regarding a prior statement that would have supported the defense theory that L.B. had consensual sex with Bell, and others, that summer. During her interview with BCI agents, M.H. stated that when she and L.B. were at Nimons's house the week before the rape, L.B. left with a male who was not Lawrence, leaving M.H. with Nimons. As L.B.'s best friend that summer, M.H. could have supported counsel's theory that L.B. was "meeting boys" and having consensual sex with them that summer. But defense counsel never asked M.H. about her statement.

**{¶34}** Although we give defense counsel the benefit of the doubt in matters of trial strategy, *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 115, "a failure to investigate, if true, is not a matter of trial tactics, but violates an essential duty owed to clients." *State v. Schlosser*, 2d Dist. Montgomery Nos. 17192 and 17193, 1999 Ohio App. LEXIS 2386, at *24 (May 28, 1999). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d 674. This duty is one that requires defense counsel to "investigate 'the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.'" *State v. Johnson*, 24 Ohio St.3d 87, 89, 494 N.E.2d 1061 (1986), quoting 1 A.B.A. Standards for Criminal Justice 91982 Supp.), No. 4-4.1.

**{¶35}** In light of counsel's failure to adequately investigate the defense theory and introduce evidence supporting that theory, we find that Bell is entitled, at a minimum, to an evidentiary hearing on the issue of whether the cumulative effect of counsel's errors rendered her assistance constitutionally ineffective. Accordingly, the trial court abused its discretion in denying Bell's petition without a hearing. The fourth assignment of error is sustained.

**E.     Ineffective Assistance of Counsel Regarding Advice Not to Testify**

**{¶36}** In his fifth assignment of error, Bell argues that the trial court erred in denying the fourth ground for relief in his petition, which asserted that he was denied effective assistance of counsel because counsel unreasonably advised him not to testify,

meaning the jury heard no explanation for the presence of his DNA on the vaginal swabs taken from L.B. after the rape, and thus no evidence to support counsel's consensual sex defense. Bell contends that counsel's advice not to testify was objectively unreasonable given the fact that neither L.B. nor M.H. could identify or name him as the attacker, and he was convicted based on L.B.'s testimony that she only had consensual sex with Lawrence that summer.

**{¶37}** Bell's affidavit, attached to his petition for postconviction relief, stated that he wanted to testify at trial. Defense counsel's affidavit, also attached to the petition, stated that counsel initially intended to have Bell testify, but then developed "serious concerns" about him testifying after he was convicted of burglary. She stated that she "explained the pros and cons of testifying" to Bell and after her explanation, Bell "insisted he did not want to testify" and that he "maintained that opinion from that point forward." Counsel stated that she asked Bell several more times whether he wanted to testify but Bell "was insistent that he did not want to testify — even though [she] explained to him the pros and cons of his failure to testify in this case (specifically with respect to sexual intercourse)." Counsel averred that Bell told her he did not want to testify "for multiple reasons, the first being his prior record, the next being the recent burglary case, and the third reason being he was just scared * * *."

**{¶38}** Because there are countless ways to provide effective assistance in any given case, judicial scrutiny of a lawyer's performance must be highly deferential. *State v. May*, 8th Dist. Cuyahoga No. 102482, 2015-Ohio-4275, ¶ 32, citing *Strickland*, 466 U.S. 668 at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. "Decisions on strategy and trial tactics

are granted wide latitude of professional judgment, and it it not the duty of a reviewing court to analyze trial counsel's legal tactics and maneuvers." *State v. Quinones*, 8th Dist. Cuyahoga No. 100928, 2014-Ohio-5544, ¶ 18. "The advice provided by a criminal defense lawyer to his or her client regarding the decision to testify is 'a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance.'" *State v. Winchester*, 8th Dist. Cuyahoga No. 79739, 2002-Ohio-2130, ¶ 12, quoting *Hutchins v. Garrison*, 724 F.2d 1425, 1436 (4th Cir. 1983), *cert. denied*, 464 U.S. 1065, 104 S.Ct. 750, 79 L.Ed.2d 207 (1984); *State v. Hunt*, 8th Dist. Cuyahoga No. 84528, 2005-Ohio-1871, ¶ 16 ("The decision whether to call a defendant as a witness falls within the purview of trial strategy.").

{¶39} Bell contends that counsel advised him not to testify, and that such advice was objectively unreasonable, such that he was denied effective assistance of counsel, in light of counsel's trial strategy that he had consensual sex with L.B. shortly before the rape. But Bell's affidavit asserting that counsel told him not to testify conflicts with counsel's affidavit asserting that Bell decided not to testify after she advised him of the pros and cons of testifying.

{¶40} Although a trial court should give affidavits filed in support of a postconviction petition "due deference," it may also "judge their credibility in determining whether to accept the affidavits as true statements of fact." *State v. Calhoun*, 86 Ohio St.3d 279, 284, 714 N.E.2d 905 (1999). Among the factors considered in assessing affidavit credibility is whether the affiants are "interested in the success of the petitioner's efforts." *Id.* at 285.

**{¶41}** Here, Bell is obviously an interested party. The trial court apparently considered counsel's affidavit more credible, finding that Bell made the decision not to testify "after being informed of the pros and cons of testifying," and that counsel's advice "fell within the realm of tactical decision making and proper lawyering."

**{¶42}** On this record, we cannot conclude that the trial court erred in finding counsel's affidavit more credible than Bell's. Consequently, Bell failed to provide material evidence outside the record that counsel advised him not to testify and was ineffective for doing so. The fifth assignment of error is therefore overruled.

**F.     Evidentiary Hearing on Bell's Postconviction Petition**

**{¶43}** In his first assignment of error, Bell contends that the trial court erred in denying his postconviction petition without an evidentiary hearing because he presented sufficient evidence that he was denied effective assistance of counsel, due process, and a fair trial. In light of our resolution of the fourth assignment of error ordering a hearing, this assignment of error is moot and we need not address it. App.R. 12(A)(1)(c).

**{¶44}** Judgment affirmed in part, reversed in part, and remanded for a hearing.

It is ordered that the parties share equally the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, ADMINISTRATIVE JUDGE

EILEEN T. GALLAGHER, J., and
PATRICIA ANN BLACKMON, J., CONCUR